1 | ALEXANDER G. CALFO (SBN 152891)
*alexander.calfo@btlaw.com*
2 | KELLEY S. OLAH (SBN 245180)
*kelley.olah@btlaw.com*
3 | STACY L. FOSTER (SBN 285544)
*stacy.foster@btlaw.com*
4 | **BARNES & THORNBURG LLP**
2029 Century Park East, Suite 300
5 | Los Angeles, California  90067
Telephone:  (310) 284-3880
6 | Facsimile:   (310) 284-3894

7 | Attorneys for Defendants
DEPUY ORTHOPAEDICS, INC.; DEPUY SYNTHES, INC.
8 | (formerly known and erroneously sued as "DePuy, Inc.");
JOHNSON & JOHNSON; and JOHNSON & JOHNSON
9 | SERVICES, INC.

10 |

11 | UNITED STATES DISTRICT COURT

12 | CENTRAL DISTRICT OF CALIFORNIA

13 |

14 | VIKKI TIMMS,                                          Case No.

15 |              Plaintiff,                        **NOTICE OF REMOVAL OF
                                                 ACTION UNDER 28 U.S.C.**
16 |       vs.                                    **SECTION 1441(b) (DIVERSITY)**

17 | DEPUY ORTHOPAEDICS, INC.;
DEPUY, INC.; JOHNSON &
18 | JOHNSON; THOMAS
SCHMALZRIED, M.D.; THOMAS
19 | P. SCHMALZRIED, M.D., A
PROFESSIONAL CORPORATION
20 | ("TPS Corp."); and DOES 1 through
20, inclusive,
21 |
              Defendants.
22 |

23 |
              Defendants DePuy Orthopaedics, Inc. ("DePuy"), DePuy Synthes, Inc.
24 |
(formerly known and erroneously sued as DePuy, Inc.), Johnson & Johnson, and
25 |
Johnson & Johnson Services, Inc. (collectively, "removing defendants"), through
26 |
undersigned counsel, hereby remove the state-court action entitled *Vikki Timms v.*
27 |
*DePuy Orthopaedics, Inc. et al.*, Civil Action No. BC584444, filed in the Superior
28 |

Court of California, County of Los Angeles.  Removal is warranted under 28 U.S.C. § 1441(b) because this is a diversity action over which the Court has original jurisdiction under 28 U.S.C. § 1332(a).

In support of removal, removing defendants state as follows:

1.      On or about June 8, 2015, plaintiff commenced this action against the removing defendants, Thomas P. Schmalzried, M.D., Thomas P. Schmalzried, a Professional Corporation (collectively, "Dr. Schmalzried") and un-named Doe defendants, by filing a complaint in the Superior Court of Los Angeles County, in the State of California, bearing case number BC584444.

2.      In this action, plaintiff alleges that she suffered various injuries as a result of being implanted with a Pinnacle Acetabular Cup System ("Pinnacle Cup System") manufactured and sold by DePuy.  (Compl. ¶¶ 44-47.)

3.      This is one of more than 8,000 similar cases pending around the country involving personal-injury allegations by plaintiffs who were implanted with a Pinnacle Cup System manufactured by DePuy.  On May 23, 2011, the Judicial Panel on Multidistrict Litigation ("MDL") issued an order establishing MDL No. 2244, *In re: DePuy Orthopaedics Inc., Pinnacle Hip Implant Products Liability Litigation*, before Judge Ed Kinkeade in the United States District Court for the Northern District of Texas.  Removing defendants intend to seek the transfer of this action to that proceeding, and will shortly provide the MDL Panel notice of this action pursuant to the "tag-along" procedure contained in the MDL Rules.

4.      As set forth more fully below, this case is properly removed pursuant to 28 U.S.C. § 1441, because the Court has subject-matter jurisdiction over it, pursuant to 28 U.S.C. § 1332, and removing defendants have satisfied the procedural requirements for removal.

## I.  REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT-MATTER JURISDICTION PURSUANT TO 28 U.S.C. §§ 1332 AND 1441.

5.  The Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1332 and 1441 because this is a civil action in which the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest, and is between citizens of different States.

### A.  Complete Diversity Of Citizenship

6.  Plaintiff is a citizen of the State of California.  (Compl. ¶ 7.)

7.  DePuy is, and was at the time plaintiff commenced this action, a corporation organized under the laws of the State of Indiana with its principal place of business in Warsaw, Indiana, and is therefore a citizen of the State of Indiana for purposes of determining diversity.  28 U.S.C. § 1332(c)(1)(C).

8.  DePuy, Inc. is now known as DePuy Synthes, Inc.  At the time plaintiff commenced this action, DePuy Synthes, Inc. was a corporation organized under the laws of the State of Delaware with its principal place of business in Warsaw, Indiana, and is therefore a citizen of the States of Delaware and Indiana for purposes of determining diversity.  28 U.S.C. § 1332(c)(1).

9.  Johnson & Johnson and Johnson & Johnson Services, Inc. are, and were at the time plaintiff commenced this action, corporations organized under the laws of the State of New Jersey with their principal places of business in New Brunswick, New Jersey, and are therefore citizens of the State of New Jersey for purposes of determining diversity.  28 U.S.C. § 1332(c)(1)(C).

10.  Dr. Schmalzried and his professional corporation are residents of the State of California.  (Compl. ¶¶ 13, 14.)

11.  Plaintiff also names numerous "Doe" defendants whose citizenship is disregarded for purposes of removal.  28 U.S.C. § 1441(b)(1).

12.    Thus, plaintiff is diverse from all of the defendants except Dr. Schmalzried.

13.    Dr. Schmalzried's presence in the case does not defeat diversity jurisdiction, however, because he was fraudulently joined.  Under the fraudulent-joinder doctrine, a court should disregard the citizenship of a defendant where, as here, there is "no possibility that the plaintiff will be able to establish a cause of action in state court against the alleged sham defendant." *Taylor v. Jeppesen DataPlan, Inc.*, No. C 10-1920 SBA, 2010 U.S. Dist. LEXIS 106160, at *5 (N.D. Cal. Sept. 27, 2010) (internal quotation marks and citation omitted); *see also McCabe v. Gen. Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir. 1987).

14.    That is precisely the case here.  Although plaintiff alleges claims against Dr. Schmalzried for strict liability, negligence, negligent and intentional misrepresentation, breach of warranty, constructive and statutory fraud and negligent infliction of emotional distress, there is no possibility that any of these claims would succeed under California law.

### 1.    Plaintiff's Claims Against Dr. Schmalzried Are Doomed To Fail Under *Mensing* And *Bartlett*.

15.    There is no possibility that plaintiff would prevail on any of her claims against Dr. Schmalzried because claims like plaintiff's – which rest on either a failure-to-warn theory or a defective-design theory – are preempted when they are brought against non-manufacturers of an FDA-approved product.  *See PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2581 (2011); *Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466 (2013); *see also* Decl. of Dr. Thomas P. Schmalzried ("Schmalzried Decl.") ¶ 2, *Sanchez v. DePuy Orthopaedics, Inc.*, No. CV 11-7867 (C.D. Cal.) (attached as Ex. 1) (attesting that Dr. Schmalzried "played no role in the manufacturing, packaging, labeling, regulatory submissions, sales, inspection, distribution, and adverse event and complaint reporting, handling or tracking for the Pinnacle Cup System").

16.   In *Mensing*, the U.S. Supreme Court ruled that all claims against generic drug manufacturers that were premised on a failure to warn are preempted by federal law based on the principle of impossibility preemption. 131 S. Ct. at 2581. According to the Supreme Court, generic manufacturers cannot be found liable on a failure-to-warn theory because generic manufacturers have no power to unilaterally effectuate a label change; rather, they must use the same labels and warnings as those approved by the FDA with respect to the brand-name version of the drug. *Id.* at 2575-76. Thus, as long as the labels and warnings for the generic form of the drug match the labels and warnings that the FDA has approved for the brand-name form of the drug, generic manufacturers cannot as a matter of law be held liable under state tort law for failing to warn.

17.   Although *Mensing* involved failure-to-warn claims, the Supreme Court has reached a similar conclusion as to product-design claims as well. In *Bartlett*, the Supreme Court held that a generic manufacturer could not "legally make [the relevant product] in another composition" under the Federal Food, Drug, and Cosmetic Act ("FDCA"). 133 S. Ct. at 2475 (internal quotation marks and citation omitted). As the Court explained, "the FDCA requires a generic drug to have the same active ingredients, route of administration, dosage form, strength, and labeling as the brand-name drug on which it is based." *Id.* (citing 21 U.S.C. §§ 355(j)(2)(A)(ii)-(v) and (8)(B); 21 C.F.R. § 320.1(c)). Because it was "not possible" for the generic manufacturer defendant in *Bartlett* to "redesign" the product at issue to make it more useful or less risky, the Court concluded that causes of action based on a defective design are likewise preempted. *See id.*; *see also Demahy v. Schwarz Pharma, Inc.*, 702 F.3d 177, 187 (5th Cir. 2012) ("[W]e are persuaded that [plaintiff's] design defect claim [against generic manufacturer] would be preempted [under *Mensing*]."), *cert. denied*, 134 S. Ct. 57 (2013); *Gardley-Starks v. Pfizer, Inc.*, 917 F. Supp. 2d 597, 611 (N.D. Miss. 2013) (Design-defect claims "are also preempted."); *In re Pamidronate Prods. Liab. Litig.*, 842 F. Supp. 2d 479, 484

1  (E.D.N.Y. 2012) ("[T]he 'federal duty of sameness[]' also applies in the context of

2  generic drug design.") (internal quotation marks and citations omitted).

3      18.   As other courts have found, these principles apply in spades to non-

4  manufacturing defendants such as Dr. Schmalzried.  After all, these defendants have

5  "no authority" to effectuate changes to the product or its labeling either.  *See, e.g.*, *In*

6  *re Fosamax Prods. Liab. Litig.*, MDL No. 2243 (JAP-LHG), No. 3:08-cv-00008-

7  JAP-LHG, 2012 U.S. Dist. LEXIS 5817, at *26-28 (D.N.J. Jan. 17, 2012) (because a

8  distributor "ha[d] no authority to initiate a labeling change" and "no power to

9  unilaterally change Fosamax labeling," it "could not independently do under federal

10  law what state law requires of it"); *see also Stevens v. Cmty. Health Care, Inc.*, No.

11  ESCV200702080, 2011 WL 6379298, at *1 (Mass. Super. Ct. Oct. 5, 2011) ("As a

12  distributor, however, [the defendant] had no ability to change labeling or warnings

13  and thus, like a generic manufacturer, [it] cannot be subject to liability in connection

14  with a state law claim premised on a 'failure to warn.'").

15      19.   In *In re Fosamax*, for example, the court granted a distributor's motion

16  for judgment on the pleadings after finding that the plaintiffs' state-law claims were

17  preempted.  2012 U.S. Dist. LEXIS 5817, at *26-28.  The plaintiffs in *In re*

18  *Fosamax* asserted a number of claims against "the authorized distributor of branded

19  Fosamax" that "emanated from a general theory of failure to warn," including

20  "defective design, negligence, fraud, misrepresentation, breach of express and

21  implied warranties, violation of consumer protection statutes, restitution, and loss of

22  consortium."  *Id.* at *20-21.  In rejecting the plaintiffs' claims, the district court

23  ruled that "[a]s a distributor of Fosamax, [the distributor] ha[d] no power to change

24  Fosamax labeling."  *Id.* at *27.  According to the court, "[t]hat power lies with the

25  applicant who . . . seek[s] approval to market Fosamax" – in that case, Merck.  *Id.*

26  Additionally, the court noted that if the FDA had become aware of new safety

27  information in connection with Fosamax use that it believed should be included in

28  the labeling, the FDA would have notified Merck, not the distributor.  *Id.*  Because

the distributor "ha[d] no authority to initiate a labeling change" and "no power to unilaterally change Fosamax labeling," it "could not independently do under federal law what state law requires of it." *Id.* at *28 (quoting *Mensing*, 131 S. Ct. at 2579) (internal quotation marks omitted).  Accordingly, the court found that "the state law claims brought against [the distributor] [were] preempted." *Id.* at *28.

20.    Here, all of plaintiff's claims against Dr. Schmalzried rest on either a failure-to-warn theory or a defective-design theory.  Because Dr. Schmalzried had "no power to unilaterally change" either the design of the FDA-regulated Pinnacle Cup System or the warnings that accompanied it, all of plaintiff's claims against him are preempted.[1]  For this reason alone, there is no possibility plaintiff would prevail on any of her claims against Dr. Schmalzried, and he is fraudulently joined.

## 2.    There Is No Possibility That Liability Would Be Imposed On Dr. Schmalzried Under California Law.

21.    Even if plaintiff's claims against Dr. Schmalzried were not preempted by federal law, there is "no possibility that the plaintiff [would] be able to establish [her] cause[s] of action in state court against" Dr. Schmalzried for additional reasons as well. *Taylor*, 2010 U.S. Dist. LEXIS 106160, at *5.

22.    **Strict Liability.**  No California court would impose strict liability on Dr. Schmalzried separate and apart from *Mensing*.  Although California allows application of strict-liability theories to participants outside the chain of distribution,

[1]    Plaintiff's failure-to-test theory is nothing more than a failure-to-warn theory in disguise and is thus barred by *Mensing* too. *See Gross v. Pfizer, Inc.*, 825 F. Supp. 2d 654, 659 (D. Md. 2011) ("Plaintiff contends that her allegation that PLIVA failed to test and inspect its products survives *Mensing*.  The Court fails to see how these allegations are but a piece of Plaintiff's larger failure to warn claims. Accordingly, *Mensing* preempts these allegations as they relate to Plaintiff's failure to warn claims."), *aff'd sub nom. Drager v. PLIVA USA, Inc.*, 741 F.3d 470 (4th Cir. 2014).

the circumstances under which such liability is permitted are extremely narrow.  In

*Bay Summit Community Ass'n v. Shell Oil Co.*, the court articulated a three-part test

for strict-liability claims against a non-manufacturing, non-distributing defendant:

> (1) the defendant received a direct financial benefit from
> its activities and from the sale of the product; (2) the
> defendant's role was integral to the business enterprise
> such that the defendant's conduct was a necessary factor in
> bringing the product to the initial consumer market; and
> (3) the defendant had control over, or a substantial ability
> to influence, the manufacturing or distribution process.

51 Cal. App. 4th 762, 766, 776, 779 (1996).  The court went on to explain that the

fact that "an entity was a link in the chain of getting goods to the market or that it

participat[ed] in marketing a defective product is not enough to establish the

defendant should be held strictly liable." *Id.* at 778 (internal quotation marks and

citation omitted); *see also Taylor v. Elliott Turbomachinery Co.*, 171 Cal. App. 4th

564, 576 (2009) (a claim for strict liability failure to warn arises only where a

plaintiff can prove, *inter alia*, that "the defendant had control over, or a substantial

ability to influence, the manufacturing or distribution process") (internal quotation

marks and citation omitted).  After all, and as other California courts have held,

"[t]here is, implicit in the strict liability standard, a requirement that the defendant

have some ability to control the manufacturing or distribution of the product."

*Bruce v. Clark Equip. Co.*, No. Civ. S-05-01766 WBS KJM, 2007 U.S. Dist. LEXIS

25331, at *11 (E.D. Cal. Mar. 26, 2007).

    23.    Here, as set forth above, Dr. Schmalzried "played no role in the

manufacturing, packaging, labeling, regulatory submissions, sales, inspection,

distribution, and adverse event and complaint reporting, handling or tracking for the

Pinnacle Cup System."  Schmalzried Decl. ¶ 2.  Accordingly, there is no reasonable

1   possibility that plaintiff can prevail on her strict-liability claims against Dr.

2   Schmalzried.[2]

3      24.   **Negligence-Based Claims.**  Plaintiff's claims against Dr. Schmalzried

4   for negligence and negligent infliction of emotional distress have no possibility of

5   success because plaintiff cannot establish that Dr. Schmalzried owed any

6   independent duty to her. As set forth in the attached declaration, Dr. Schmalzried

7   was merely "one of eight surgeons selected by DePuy who provided assistance to

8   DePuy with the design of the Pinnacle Cup System." Schmalzried Decl. ¶ 3. No

9   duty arises from "being the developer, inventor, or patent holder of a product or

10   design." *Murphy v. Aventis Pasteur, Inc.*, 270 F. Supp. 2d 1368, 1376-77 (N.D. Ga.

11   2003); *see also Weseloh Family Ltd. P'ship v. K.L. Wessel Constr. Co.*, 125 Cal.

12   App. 4th 152, 164 (2004) (design engineers could not be held liable for general

13   negligence because they owed no duty of care to plaintiff property owners; courts

14   have "invoked the concept of duty to limit [] the otherwise potentially infinite

15   liability which would follow from every negligent act"); *In re Rezulin Litig.*, No. CV

16   03-1643-R(RZX), 2003 WL 25598915, at *1 (C.D. Cal. Apr. 28, 2003) (holding that

17   a patent holder and clinical investigator of an allegedly defective prescription drug

18   was fraudulently joined because he "owed no legal duty to any of the plaintiffs, and

19   therefore, there [was] no possibility that the plaintiffs [could] prove a cause of action

20   against [him]").

21

22

---

23   [2]    In addition, plaintiff's design-defect strict-liability claim against Dr.

24   Schmalzried is also barred because, under California law, "the entire category of

25   medical implants available only by resort to the services of a physician are immune
from design defect strict liability." *Artiglio v. Superior Court*, 22 Cal. App. 4th

26   1388, 1397 (1994) (same); *see also Hufft v. Horowitz*, 4 Cal. App. 4th 8, 19 (1992).

27   There is no contention anywhere in plaintiff's complaint that her Pinnacle Cup
System was obtained other than by the services of a physician.

28

25.    These rulings make good sense.  Otherwise, every individual who had
any role in the design of any component of any product, such as a vehicle, would
potentially be liable for negligence any time an individual was injured using it.
Such an approach would result in limitless liability for millions of Americans who
work in any capacity in which they provide input into the design or manufacturing
of any products.  Accordingly, our legal system limits liability to the actual
manufacturer of a product, which has a duty of care to those who buy its products.
*Morrow v. Wyeth*, No. B-05-209, 2005 U.S. Dist. LEXIS 43194, at *13-14 (S.D.
Tex. Oct. 13, 2005) (noting that the law places liability on the manufacturer of an
allegedly defective product, not on the specific individuals involved in the design
and manufacture of the product).  For this reason, too, Dr. Schmalzried is
fraudulently joined.

26.    Plaintiff's claim against Dr. Schmalzried for negligent infliction of
emotional distress is destined to fail for the same reason.  California law is clear that
"there is no independent tort of negligent infliction of emotional distress" and that
such a claim is merely a "species of negligence."  *Delfino v. Agilent Techs., Inc.*,
145 Cal. App. 4th 790, 818 (2006).  Accordingly, if a defendant has no independent
duty to a plaintiff capable of giving rise to a negligence claim, the defendant cannot
be held liable for negligent infliction of emotional distress either.  *Id.*; *see also*
*Friedman v. Merck & Co.*, 107 Cal. App. 4th 454, 475 (2003) (plaintiff could not
recover for negligent infliction of emotional distress where defendant had no duty to
plaintiff).  As set forth above, plaintiff has not shown – and cannot show – that Dr.
Schmalzried had an independent duty to her.  Accordingly, her claim for negligent
infliction of emotional distress has no chance of success either.  For this reason too,
Dr. Schmalzried is fraudulently joined.

27.    **Breach-of-Warranty Claims.**  Plaintiff's breach-of-warranty claims
against Dr. Schmalzried would also have no possibility of success because plaintiff
does not allege that Dr. Schmalzried is a "seller" for purposes of warranty law. *See*

Cal. Com. Code § 2313(a) ("Any affirmation of fact or promise ***made by the seller***
to the buyer which relates to the goods and becomes part of the basis of the bargain
creates an express warranty that the goods shall conform to the affirmation or
promise.") (emphasis added); Cal. Com. Code § 2314 (a "warranty that the goods
shall be merchantable is implied in a contract for their sale if the seller is a merchant
with respect to goods of that kind"). As court after court has held, warranty claims
are only properly brought against the party that sold the product – not against the
individuals who represent or work for the manufacturer. *See, e.g.*, *In re Rezulin*
*Prods. Liab. Litig.*, 133 F. Supp. 2d 272, 286 (S.D.N.Y. 2001) (sales representatives
were fraudulently joined because, *inter alia*, no warranty claim could possibly be
asserted against them insofar as they "were not 'sellers' of the product for purposes
of warranty; the 'seller' who impliedly warranted the merchantability of Rezulin
was the pharmaceutical manufacturer"); *In re Diet Drugs (Phentermine,*
*Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 220 F. Supp. 2d 414, 425 (E.D.
Pa. 2002) (removal proper where plaintiffs failed to cite "any authority for the
proposition that a sales representative, as opposed to the manufacturer of the product
he or she was selling, would ever be liable as the warrantor of the product"; "[o]n
the contrary, sales representatives are not considered 'sellers' under Mississippi law,
but rather, employees of the businesses who are sellers") (internal quotation marks
and citation omitted).

28. Here, plaintiff makes no allegation that Dr. Schmalzried sold her the
Pinnacle Cup System. Because plaintiff has not – and cannot – allege that Dr.

Schmalzried was the seller – and thus the warrantor – of the product, her warranty-based claims would fail as a matter of law.[3]

29.    **Fraud-Based Claims.**  Plaintiff's claims against Dr. Schmalzried for negligent misrepresentation, intentional misrepresentation, alleged violations of the Unfair Competition Law ("UCL") and the False Advertising Law ("FAL") and constructive fraud (collectively, plaintiff's "fraud-based claims") cannot succeed because:  (1) plaintiff does not identify a single statement made by Dr. Schmalzried that was allegedly deceptive; and (2) plaintiff fails to establish any connection between any actions by Dr. Schmalzried and her implantation with the Pinnacle Cup System that could possibly satisfy the reliance/causation elements of her fraud-based claims.

30.    Under California law, causes of action for intentional and negligent misrepresentation require a plaintiff to prove, *inter alia*, that the defendant engaged in a misrepresentation and that the plaintiff relied on it.  *See, e.g., Young v. Fluorotronics, Inc.*, No. 10cv976-WQH-BGS, 2010 U.S. Dist. LEXIS 117362, at *22-23 (S.D. Cal. Nov. 3, 2010) ("The . . . elements of a cause of action for [intentional misrepresentation] are:  (1) a misrepresentation, which includes a concealment or nondisclosure; (2) knowledge of the falsity of the misrepresentation, i.e., scienter; (3) intent to induce reliance on the misrepresentation; (4) justifiable reliance; and (5) resulting damages.") (internal quotation marks and citation omitted); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Servs. Grp., Inc.*, 89 Cal. Rptr. 3d 473, 483 (Cal. Ct. App. 2009) ("The elements of

---

[3]    Even if Dr. Schmalzried could be characterized as a "seller" – and he cannot – plaintiff's implied-warranty claims against Dr. Schmalzried would still be barred because plaintiff cannot possibly prove that she "relied on [Dr. Schmalzried's] skill or judgment to select or furnish a suitable product," as required under California law.  *See Evraets v. Intermedics Intraocular, Inc.*, 29 Cal. App. 4th 779, 789 (1994).

negligent misrepresentation are (1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage") (internal quotation marks and citation omitted).

31.    The UCL similarly prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising," Cal. Bus. & Prof. Code § 17200, and requires a plaintiff to allege that she relied on the alleged misconduct in a way that caused harm, *see* Cal. Bus. & Prof. Code § 17204 (plaintiff must show "injury in fact and [loss of] money or property as a result" of the unfair business practice). And Cal. Bus. & Prof. Code § 17500, the FAL, requires that a plaintiff demonstrate reliance on the allegedly false or misleading statements. *See In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1093 (S.D. Cal. 2010) ("a plaintiff alleging violations of the FAL must allege actual reliance").

32.    Likewise, constructive fraud arises only "on a breach of duty by one in a confidential or fiduciary relationship to another which induces justifiable reliance by the latter to his prejudice." *Tyler v. Children's Home Soc'y*, 29 Cal. App. 4th 511, 548 (1994). Thus, to prove a claim for constructive fraud, "[a]ctual reliance . . . must be shown." *Id.*

33.    Importantly, plaintiff must allege these elements of her fraud-based claims with the particularity required by Federal Rule of Civil Procedure 9(b). *See, e.g., Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1141 (C.D. Cal. 2003) ("It is well-established in the Ninth Circuit that both claims for fraud and negligent misrepresentation must meet Rule 9(b)'s particularity requirements.") (citation omitted); *Baltazar v. Apple, Inc.*, No. CV-10-3231-JF, 2011 WL 588209, at *3 (N.D. Cal. Feb. 10, 2011) (holding that plaintiff must satisfy the pleading requirements of Rule 9(b) in order to state a claim for negligent misrepresentation);

1 | *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods.*
2 | *Liab. Litig.*, 826 F. Supp. 2d 1180, 1204 (C.D. Cal. 2011) (granting motion to
3 | dismiss CLRA claims where plaintiffs failed to meet the heightened pleading
4 | requirements of Rule 9(b)). The "mere assertion of reliance is insufficient" to
5 | support fraud-based claims; rather, a "plaintiff must allege the specifics of his or her
6 | reliance on the representation to show a bona fide claim of actual reliance." *Cadlo*
7 | *v. Owens-Illinois, Inc.*, 125 Cal. App. 4th 513, 520 (2004); *In re Rezulin*, 133 F.
8 | Supp. 2d at 283 (defendant fraudulently joined because, *inter alia*, plaintiffs did not
9 | meet Rule 9(b)'s requirements where they failed to allege "the time and place of
10 | particular representations").

11 |     34.    Here, plaintiff has not identified any statements that Dr. Schmalzried
12 | allegedly made to her (or her physician) regarding the safety or efficacy of the
13 | Pinnacle Cup System. Nor has she alleged that she (or her doctor) relied on any
14 | such statements in selecting the Pinnacle Cup System – let alone with the
15 | particularity required by Rule 9(b). Instead, plaintiff merely offers vague,
16 | unsupported allegations that all defendants – at some unspecified time and place –
17 | misrepresented the "safety" and "efficacy" of the Pinnacle Cup System. For both of
18 | these reasons, there is no "possibility" that plaintiff can recover against the
19 | physician on her fraud-based claims. *See, e.g., Aronis v. Merck & Co.*, No. CIV. S-
20 | 05-0486 WBS DAD, 2005 WL 5518485, at *1 (E.D. Cal. May 3, 2005) (finding
21 | fraudulent joinder of a distributor where "plaintiff d[id] not allege that [the
22 | distributor] contributed in any way to her injuries"; "[t]o state a claim against a
23 | defendant, a plaintiff must allege a causal connection between the injury and the
24 | conduct of that defendant").[4]

25 |

26 | [4]     Plaintiff's constructive-fraud claim against Dr. Schmalzried would also fail
27 | because she has not alleged a fiduciary or confidential relationship with him. *See*
28 | *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 981 n.13 (1997)
    | (footnote continued)

35.     In short, there is no possibility that plaintiff would prevail on any of her claims against Dr. Schmalzried, and Dr. Schmalzried is therefore fraudulently joined.

> **3.     Plaintiff Does Not Segregate Her Legal Allegations Against Dr. Schmalzried – Or Support Them With Any Specific Facts – Further Demonstrating That He Was Fraudulently Joined.**

36.     The fact that plaintiff's legal allegations are targeted at "defendants" generally – rather than Dr. Schmalzried in particular – further demonstrates that he was fraudulently joined.  For example, in her causes of action for strict liability and negligence, plaintiff makes only broad, collective and conclusory claims against a group generically described as "defendants," lumping Dr. Schmalzried together with the removing defendants.  (*See, e.g.*, Compl. ¶ 49 ("Defendants designed, distributed, manufactured, sold, and marketed the Pinnacle Hip . . . ."); *id.* ¶ 53 ("Defendants consciously disregarded this increased risk of harm by failing to warn of such risks; unlawfully concealing the dangerous problems associated with implantation of the Pinnacle Hip; and continuing to market, promote, sell and defend the Pinnacle Hip."); *id.* ¶ 69 ("Defendants were negligent and careless in and about their design, testing, distribution, manufacture, advertising, sale and marketing of the above-described Pinnacle Hip.").)  Likewise, with regard to her warranty-

---

("Constructive fraud allows conduct insufficient to constitute actual fraud to be treated as such *where the parties stand in a fiduciary relationship*.") (emphasis added); *Guthrie v. Times-Mirror Co.*, 51 Cal. App. 3d 879, 889 (1975) (rejecting a constructive-fraud claim where there was no confidential relationship between the parties).  Similarly, to the extent plaintiff's fraud-based claims are premised on alleged concealment (*see, e.g.*, Compl. ¶ 119), they fail for the additional reason that Dr. Schmalzried did not owe plaintiff a duty to disclose, *see, e.g.*, *Milne Emps. Ass'n v. Sun Carriers, Inc.*, 960 F.2d 1401, 1408 (9th Cir. 1992) (claim for "suppression of facts . . . generally requires a duty to disclose the concealed fact") (applying California law).

based claims, plaintiff makes only broad and generic allegations about unspecified representations allegedly made by all "defendants." (*See, e.g.*, *id.* ¶ 94 ("Defendants impliedly warranted that the Pinnacle Hip, which Defendants designed, manufactured, assembled, promoted and sold to Plaintiff Vikki Timms and Plaintiff's physicians, was merchantable and fit and safe for ordinary use."); *id.* ¶ 99 ("Defendants expressly warranted to Plaintiff Vikki Timms by and through their authorized agents or sales representatives, in publications, package inserts, the internet, and other communications intended for physicians, patients, Plaintiff, and the general public, that the Pinnacle Hip was safe, effective, fit and proper for its intended use.").) Similarly, plaintiff's fraud-based claims only contain generic allegations directed at "defendants." (*See, e.g.*, *id.* ¶ 111 ("Defendants misled Plaintiff, Plaintiff's physicians, and the public into believing that the Pinnacle Hip was safe and effective for use in hip replacement surgery; engaged in deceptive, misleading and unconscionable promotional or sales methods to convince health care professionals and patients to use the Pinnacle Hip, even though Defendants knew or should have known that the Pinnacle Hip was unreasonably unsafe.").)

37.     As numerous courts have found, the fact that all of plaintiff's legal allegations are targeted at "defendants" generally – rather than Dr. Schmalzried in particular – further demonstrates that he was fraudulently joined. *See, e.g.*, *Shah v. Wyeth Pharm., Inc.*, No. CV 04-8652 DT (MANx), 2005 WL 6731641, at *3 (C.D. Cal. Jan. 18, 2005) ("[A]llegations against 'defendants' collectively are insufficient to warrant remand, especially when Plaintiffs fail to allege any 'particular or specific activity'" on the part of each of the non-diverse defendants.) (quoting *Badon v. RJR Nabisco, Inc.*, 224 F.3d 382, 391-92 (5th Cir. 2000)); *see also Gomes v. Michaels Stores, Inc.*, No. S-06-1921 LKK/KJM, 2006 U.S. Dist. LEXIS 81354, at *4-7 (E.D. Cal. Oct. 27, 2006) (dismissing non-diverse defendant and refusing to remand case where plaintiff generally "state[d] that all defendants' acts 'were performed partly within and partly outside the course and scope of their authority

and employment'" but did not include any specific allegations about the non-diverse defendant) (citing complaint); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, MDL No. 1407, No. C02-423R, 2002 WL 34418423, at *2, *3 (W.D. Wash. Nov. 27, 2002); *Bennett v. Allstate Ins. Co.*, 753 F. Supp. 299, 301 (N.D. Cal. 1990) (denying motion to remand because, *inter alia*, plaintiff's complaint made "no attempt" to "differentiate between the conduct" of the defendants).

38.    For this reason too, Dr. Schmalzried is fraudulently joined, and his citizenship must be disregarded for jurisdictional purposes.

**B.    Amount In Controversy**

39.    Plaintiff claims that she has suffered "serious physical injuries, including . . . severe hip pain." (Compl. ¶ 44.)  Plaintiff seeks general damages, economic damages and disgorgement of revenue. (*See id.*, Prayer For Relief.)

40.    It is widely recognized that personal-injury claims facially meet the $75,000 jurisdictional threshold. *See, e.g., In re Rezulin Prods. Liab. Litig.*, 133 F. Supp. 2d 272, 296 (S.D.N.Y. 2001) (finding that a complaint alleging various injuries from taking a prescription drug "obviously asserts a claim exceeding $75,000"); *Smith v. Wyeth, Inc.*, 488 F. Supp. 2d 625, 630-31 (W.D. Ky. 2007) (denying motion to remand); *Copley v. Wyeth, Inc.*, No. 09-722, 2009 WL 1089663, at *3 (E.D. Pa. Apr. 22, 2009) (same).

41.    Given plaintiff's claim that she has suffered "serious physical injuries" including "severe hip pain," as well as her request for general damages, economic damages and disgorgement of revenue, it is evident that the amount of recovery sought by plaintiff exceeds $75,000.

## II.   REMOVING DEFENDANTS HAVE SATISFIED THE PROCEDURAL REQUIREMENTS FOR REMOVAL.

42.   DePuy was served with plaintiff's Complaint on June 12, 2015.  None of the other defendants has been served.  Accordingly, this Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b).

43.   The Superior Court of Los Angeles County is located within the Central District of California.  *See* 28 U.S.C. § 1441(a).

44.   None of the removing defendants is a citizen of the State of California, the State where this action was brought.  *See* 28 U.S.C. § 1441(b)(2).

45.   It is well settled that co-defendants who are fraudulently joined need not join in the removal.  *See Borsuk v. Mass. Mut. Life Ins. Co.*, No C 03-630 VRW, 2003 U.S. Dist. LEXIS 25259, at *7-8 (N.D. Cal. Sept. 4, 2003).  As set forth above, Dr. Schmalzried is fraudulently joined.  *See* Section I.A, above.  Therefore, he need not consent to removal.

46.   No previous application has been made for the relief requested herein.

47.   Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings and orders served upon removing defendants, which papers include the complaint, are attached collectively as Exhibit 2.

48.   Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for plaintiff and a copy is being filed with the Clerk of the Superior Court of the County of Los Angeles.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1       WHEREFORE, removing defendants respectfully remove this action from the

2  Superior Court of the County of Los Angeles, in the State of California, bearing

3  Number BC584444, to this Court.

4                        Respectfully submitted,

5  Dated:  July 13, 2015         **BARNES & THORNBURG LLP**

6

7                        By:_____

8                          Alexander G. Calfo

                          Kelley S. Olah

9                          Stacy L. Foster

                        Attorneys for Defendants

10                       DEPUY ORTHOPAEDICS, INC.;

                     DEPUY SYNTHES, INC. (formerly

11                       known and erroneously sued as

                     DEPUY, INC.); JOHNSON &

12                       JOHNSON; and JOHNSON &

                     JOHNSON SERVICES, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

1  Ralph A. Campillo (Bar No. 70376)
2  Wendy A. Tucker  (Bar No. 121122)
   Michael M. Walsh (Bar No. 150865)
3  SEDGWICK LLP
4  801 South Figueroa Street, 19th Floor
   Los Angeles, CA 90017-5556
5  Telephone: 213.426.6900
6  Facsimile: 213.426.6921
   Email : ralph.campillo@sedgwicklaw.com
7          wendy.tucker@sedgwicklaw.com
           michael.walsh@sedgwicklaw.com
8  Attorneys for Defendant
9  THOMAS P. SCHMALZRIED, M.D.

10

11              UNITED STATES DISTRICT COURT
        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
12

13 | ARMAND SANCHEZ, et al.,          | CASE NO. CV 11-7867
14 |                                   |
   |         Plaintiffs,               | **DECLARATION OF DR. THOMAS
15 |                                   | P. SCHMALZRIED**
16 | vs.                               |
   |                                   | Judge:  Hon. Jacqueline H. Nguyen
17 | DEPUY ORTHOPAEDICS, INC., et      |
18 | al.,                              |
19 |         Defendants.               |

20 | CATHERINE SHELTON,                | CASE NO. 2:11-cv-08082
21 |                                   |
22 |         Plaintiff,                | **DECLARATION OF DR. THOMAS
   |                                   | P. SCHMALZRIED**
23 | vs.                               |
24 |                                   | Judge:  Hon. Dean D. Pregerson
   | DEPUY ORTHOPAEDICS, INC., et      |
25 | al.,                              |
26 |                                   |
   |         Defendants.               |
27

28                    Decl. of Dr. Thomas P. Schmalzried

                              1

EXHIBIT  1 = 000020

I, THOMAS P. SCHMALZRIED, pursuant to 28 U.S.C. § 1746, hereby

declare under penalty of perjury that the following statements are true and correct, to

the best of my knowledge and belief:

1.      I am a practicing orthopedic surgeon and the Medical Director of the Joint

Replacement Institute in Los Angeles, California.  I am also the principal for Thomas

P. Schmalzried, M.D., A Professional Corporation, a California corporation.

2.      I played no role in the manufacturing, packaging, labeling, regulatory

submissions, sales, inspection, distribution, and adverse event and complaint

reporting, handling or tracking for the Pinnacle Cup System.  I had no control or

influence over DePuy's manufacturing, packaging, labeling, regulatory, sales,

inspection, distribution and adverse event and complaint reporting, handling or

tracking decisions regarding the Pinnacle Cup System.

3.      I was one of eight surgeons selected by DePuy who provided assistance to

DePuy with the design of the Pinnacle Cup System.  DePuy determined the final

design specifications for the Pinnacle Cup System and the product labeling content.

4.      The DePuy brochure, "Advancing High Stability and Low Wear" was created

by DePuy.  My only contribution to this brochure was a general educational

summary (including references to thirty four scientific and medical articles as

support for the data in this summary), written at the request of DePuy, entitled "High

Stability, Low Wear Metal-on-Metal Bearings: Benefits, Risks, and Alternatives."

Decl. of Dr. Thomas P. Schmalzried

2

EXHIBIT  1 - 000021

1   As the title reflects, this paper discusses the benefits, risks and alternatives to metal-

2

3   on-metal bearings.  The paper clearly outlines the special risks associated with all

4   metal-metal bearings, and states my belief that "there is insufficient clinical data to

5   demonstrate the overall superiority of any single bearing couple for all total hip

6   patients" and "it is therefore reasonable to individualize the choice of bearing."  The

7

8   only Pinnacle-specific data in this educational paper was provided by DePuy and

9   clearly labeled as "DePuy Internal Data."

10  5.      I was not a part of DePuy's internal complaint handling system for the

11

12  Pinnacle Cup System and thus was not notified if DePuy received such complaints.

13  6.      I have never made any representations or statements to any physicians, or to

14  any member of the public, including plaintiff, regarding whether a specific DePuy

15

16  orthopedic implant product was suitable for any specific patient.  That is a decision

17  made by the patient's physician and not by me.

18  I declare under penalty of perjury that the foregoing is true and correct.

19

20                                    Executed on  10 / 27        , 2011.

21

22

23                                    THOMAS P. SCHMALZRIED, M.D.

24

25

26

27

28                          Decl. of Dr. Thomas P. Schmalzried

                                          3

EXHIBIT 1 - 000022

EXHIBIT 2

6/12/15
2:10 PM
AO

# COPY

## BY FAX

**SUMMONS**
*(CITACION JUDICIAL)*

SUM-100



FOR COURT USE ONLY
CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

**JUN 0 8 2015**

Sherri R. Carter, Executive Officer/Clerk
By Shaunya Bolden, Deputy

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Depuy Orthopaedics, Inc.; Depuy, Inc.; Johnson & Johnson; Thomas Schmalzried, M.D.; Thomas Schmalzried, M.D., A Professional Corp. and DOES 1 through 20 inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Vikki Timms

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

The name and address of the court is:
*(El nombre y dirección de la corte es):* Los Angeles Superior Court

CASE NUMBER:
*(Número del Caso):*
**BC 5 8 4 4 4 4**

Stanley Mosk Courthouse
111 North Hill Street, Los Angeles, CA 90012

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

DOYLE LOWTHER LLP, 10200 Willow Creek Road, Suite 150, San Diego, CA 92131

DATE:
*(Fecha)* **JUN 0 8 2015**

Clerk, by **SHAUNYA BOLDEN**, Deputy
*(Secretario)* *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* Depuy Orthopaedics, Inc.

under: ☒ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify):*

4. ☒ by personal delivery on *(date):* 6-12-15

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2000]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

Page 1 of 1

EXHIBIT   2 – 000023

COPY

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

William J. Doyle II (SBN 188069); Chris W. Cantrell (SBN 290874)
DOYLE LOWTHER LLP
10200 Willow Creek Road, Suite 150
San Diego, CA 92131

TELEPHONE NO: (858) 935-9960    FAX NO: (858) 939-1939

ATTORNEY FOR (Name):

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
Vikki Timms v. Depuy Orthopaedics, Inc., et al.

**CONFORMED COPY**
**ORIGINAL FILED**
Superior Court of California
County of Los Angeles

**JUN 08 2015**

Sherri R. Carter, Executive Officer/Clerk

By Shaunya Bolden, Deputy

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: |
|---|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | BC 584444 |

JUDGE:

DEPT:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[✓] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is  [✓] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:

a. [ ] Large number of separately represented parties
b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [ ] Substantial amount of documentary evidence

d. [ ] Large number of witnesses
e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [✓] monetary  b. [ ] nonmonetary; declaratory or injunctive relief  c. [✓] punitive
4. Number of causes of action (specify): 13
5. This case [ ] is  [✓] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related cases. (You may use form CM-015.)

Date: June 8, 2015
Chris W. Cantrell

_____
(TYPE OR PRINT NAME)

Chris W. Ca ___
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 (Rev. July 1, 2007)

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

EXHIBIT 2 — 000024

# COPY

| SHORT TITLE: TIMMS v. DEPUY ORTHOPAEDICS, INC. | CASE NUMBER | BC 5 8 4 4 4 4 |
|---|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.

Item I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ✓YES    CLASS ACTION? YES  LIMITED CASE? YES  TIME ESTIMATED FOR TRIAL 7 (seven)    HOURS/✓DAYS

Item II. Indicate the correct district and courthouse location (4 steps – if you checked "Limited Case", skip to Item III, Pg. 4):

**BY FAX**

Step 1: After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column A, the Civil Case Cover Sheet case type you selected.

Step 2: Check one Superior Court type of action in Column B below which best describes the nature of this case.

Step 3: In Column C, circle the reason for the court location choice that applies to the type of action you have checked.  For any exception to the court location, see Local Rule 2.3.

### Applicable Reasons for Choosing Courthouse Location (see Column C below)

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondant functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory Filing Location (Hub Case)

Step 4: Fill in the information requested on page 4 in Item III; complete Item IV.  Sign the declaration.

| | A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070 Asbestos Property Damage | 2. |
| | | ☐ A7221 Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☑ A7260 Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210 Medical Malpractice - Physicians & Surgeons | 1., 4. |
| | | ☐ A7240 Other Professional Health Care Malpractice | 1., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250 Premises Liability (e.g., slip and fall) | 1., 4. |
| | | ☐ A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 4. |
| | | ☐ A7270 Intentional Infliction of Emotional Distress | 1., 3. |
| | | ☐ A7220 Other Personal Injury/Property Damage/Wrongful Death | 1., 4. |

LACIV 109 (Rev 3/15)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 1 of 4

EXHIBIT 2 - 000025

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
NOTICE OF CASE ASSIGNMENT - UNLIMITED CIVIL PERSONAL INJURY CASE

Case Number _____

THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

Your case is assigned for all purposes to the judicial officer indicated below (Local Rule 3.3(c)).

BC 5 8 4 4 4 4

| ASSIGNED JUDGE | DEPT | ROOM | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|
| Hon. Michael J. Raphael | 91 | 632 | | | |
| Hon. Elia Weinbach | 92 | 633 | | | |
| Hon. Howard L Halm | 93 | 631 | | | |
| Hon. Teresa Beaudet | 97 | 630 | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record on JUN 0 8 2015      SHERRI R. CARTER, Executive Officer/Clerk

By _____, Deputy Clerk

LACIV PI 190 (Rev12/14)
LASC Approved 05-06
For Optical Use

NOTICE OF CASE ASSIGNMENT –
UNLIMITED CIVIL CASE

EXHIBIT 2 - 000026

**FILED**

LOS ANGELES SUPERIOR COURT

JAN 2 6 2015

SHERRI R. CARTER, EXECUTIVE OFFICER/CLERK

C. Casarez

BY C. CASAREZ, DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| In re Personal Injury Cases Assigned to the Personal Injury Courts (Departments 91, 92, 93, and 97) | Case No.: |
| | FOURTH AMENDED GENERAL ORDER RE PERSONAL INJURY COURT ("PI Court") PROCEDURES (Effective as of January 26, 2015) |

DEPARTMENT:  91  92  93  97

FINAL STATUS CONFERENCE ("FSC"):

- Date: _____ at 10:00 a.m.

TRIAL:

- Date: _____ at 8:30 a.m.

OSC re DISMISSAL (Code Civ. Proc., § 583.210):

- Date: _____ at 8:30 a.m.

TO EACH PARTY AND TO THE ATTORNEY OF RECORD FOR EACH PARTY:

Pursuant to the California Code of Civil Procedure ("C.C.P."), the California

Rules of Court, and the Los Angeles County Court Rules ("Local Rules"), the Los

Angeles Superior Court ("LASC" or "Court") HEREBY AMENDS AND

SUPERSEDES ITS November 10, 2014 AMENDED GENERAL ORDER AND

1/26/15

EXHIBIT 2 - 000027

1  GENERALLY ORDERS AS FOLLOWS IN THIS AND ALL OTHER GENERAL

2  JURISDICTION PERSONAL INJURY ACTIONS:

3       Effective March 18, 2013, the Court responded to systemic budget reductions by

4  centralizing the management of more than 18,000 general jurisdiction personal injury cases

5  in the Stanley Mosk Courthouse.  LASC opened three Personal Injury Courts ("PI Courts")

6  (Departments 91, 92 and 93), and on January 6, 2014, a fourth (Department 97) to adjudicate

7  all pretrial matters for these cases.  It also established a Master Calendar Court (Department

8  One), to manage the assignment of trials to dedicated Trial Courts located countywide.  This

9  Amended General Order lays out the basic procedures for the PI Courts' management of

10  pretrial matters.  The parties will find additional information about the PI Courts on the

11  court's website, *www.lacourt.org.*

12

13  1.   To ensure proper assignment to a PI Court, Plaintiff(s) must carefully fill out the Civil

14  Case Cover Sheet Addendum (form LACIV 109).  The Court defines "personal injury" as:

15       "an unlimited civil case described on the Civil Case Cover Sheet Addendum and

16       Statement of Location (LACIV 109) as Motor Vehicle-Personal Injury/Property

17       Damage/Wrongful Death; Personal Injury/Property Damage/Wrongful Death-

18       Uninsured Motorist; Product Liability (other than asbestos or

19       toxic/environmental); Medical Malpractice-Physicians & Surgeons; Other

20       Professional Health Care Malpractice; Premises Liability; Intentional Bodily

21       Injury/Property Damage/Wrongful Death; or Other Personal Injury/Property

22       Damage/Wrongful Death. An action for intentional infliction of emotional

23       distress, defamation, civil rights/discrimination, or malpractice (other than

24       medical malpractice), is not included in this definition. An action for injury to

25       real property is not included in this definition."   Local Rule 2.3(a)(1)(A).

26

27

                                            2                                    1/26/15

EXHIBIT  2 - 000028

1    The Court will assign a case to the PI Courts if plaintiff(s) check any of the following

2    boxes in the Civil Case Cover Sheet Addendum:

3             A7100 Motor Vehicle – Personal Injury/Property Damage/Wrongful

4             Death

5

6             A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured

7             Motorist

8             A7260 Product Liability (not asbestos or toxic/environmental)

9             A7210 Medical Malpractice – Physicians & Surgeons

10            A7240 Medical Malpractice – Other Professional Health Care Malpractice

11            A7250 Premises Liability (e.g., slip and fall)

12

13            A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g.,

14            assault, vandalism etc.)

15            A7220 Other Personal Injury/Property Damage/Wrongful Death

16    The Court will not assign cases to the PI Courts if plaintiff(s) check any boxes

17    elsewhere in the Civil Case Cover Sheet Addendum (any boxes on pages two and

18    three of that form).

19

20    2.    The Court sets the above dates in this action in the PI Court circled above

21    (Department 91, 92, 93, or 97) at the Stanley Mosk Courthouse, 111 North Hill Street, Los

22    Angeles, CA 90012. Cal. Rules of Court, Rules 3.714(b)(3), 3.729.

23    **SERVICE OF SUMMONS AND COMPLAINT**

24    3.    Plaintiff(s) shall serve the summons and complaint in this action upon defendant(s) as

25    soon as possible but not later than three years from the date when the complaint is filed. C.

26    C. P. § 583.210, subd. (a). On the OSC re Dismissal date noted above, the PI Court will

27

<center>3</center>

1/26/15

EXHIBIT 3 – 000029

1  dismiss the action and/or all unserved parties unless the plaintiff(s) show cause why the

2  action or the unserved parties should not be dismissed. C.C.P. §§ 583.250; 581, subd. (b)(4).

3  4.      The Court sets the above trial and FSC dates on condition that plaintiff(s) effectuate

4  service on defendant(s) of the summons and complaint within six months of filing the

5  complaint.

6

7  5.      The PI Court will dismiss the case without prejudice pursuant to C.C.P. § 581 where

8  no party appears for trial.

9  **STIPULATIONS TO CONTINUE TRIAL**

10  6.      Provided that all parties agree (and there is no violation of the "five-year rule," C.C.P.

11  § 583.310), the parties may advance or continue any trial date in the PI Courts without

12  showing good cause or articulating any reason or justification for the change.  To continue or

13  advance a trial date, the parties (or their counsel of record) should jointly execute and file (in

14  Room 102 of the Stanley Mosk Courthouse; fee required) a Stipulation to Continue Trial,

15  FSC and Related Motion/Discovery Dates (form available on the court's website, Personal

16  Injury Court link).  The PI Courts schedule FSCs for 10:00 a.m., eight court days before the

17  trial date.  Parties seeking to continue the trial and FSC dates shall file the Stipulation at least

18  eight court days before the FSC date.   Parties seeking to advance the trial and FSC dates

19  shall file the Stipulation at least eight court days before the proposed advanced FSC date.

20  Code Civ. Proc., § 595.2;   Govt. Code § 70617, subd. (c)(2).   In selecting a new trial date,

21  parties should avoid setting on any Monday, or the Tuesday following a court holiday.

22

23

24  **NO CASE MANAGEMENT CONFERENCES**

25  7.      The PI Courts do not conduct Case Management Conferences.  The parties need not

26  file a Case Management Statement.

27

4                                      1/26/15

EXHIBIT 2 - 000030

1    dismiss the action and/or all unserved parties unless the plaintiff(s) show cause why the

2    action or the unserved parties should not be dismissed. C.C.P. §§ 583.250; 581, subd. (b)(4).

3    4.      The Court sets the above trial and FSC dates on condition that plaintiff(s) effectuate

4    service on defendant(s) of the summons and complaint within six months of filing the

5    complaint.

6
     5.      The PI Court will dismiss the case without prejudice pursuant to C.C.P. § 581 when
7
     no party appears for trial.
8

9    **STIPULATIONS TO CONTINUE TRIAL**

10   6.      Provided that all parties agree (and there is no violation of the "five-year rule," C.C.P.

11   § 583.310), the parties may advance or continue any trial date in the PI Courts without

12   showing good cause or articulating any reason or justification for the change.  To continue or

13   advance a trial date, the parties (or their counsel of record) should jointly execute and file (in

14   Room 102 of the Stanley Mosk Courthouse; fee required) a Stipulation to Continue Trial,

15   FSC and Related Motion/Discovery Dates (form available on the court's website, Personal

16   Injury Court link).  The PI Courts schedule FSCs for 10:00 a.m., eight court days before the

17   trial date.  Parties seeking to continue the trial and FSC dates shall file the Stipulation at least

18   eight court days before the FSC date.   Parties seeking to advance the trial and FSC dates

19   shall file the Stipulation at least eight court days before the proposed advanced FSC date.

20   Code Civ. Proc., § 595.2;   Govt. Code § 70617, subd. (c)(2).   In selecting a new trial date,

21   parties should avoid setting on any Monday, or the Tuesday following a court holiday.

22

23

24   **NO CASE MANAGEMENT CONFERENCES**

25   7.      The PI Courts do not conduct Case Management Conferences.  The parties need not

26   file a Case Management Statement.

27

                                                4                                          1/26/15

EXHIBIT 2 - 000031

1
2
3  **LAW AND MOTION**

4  **ALL DOCUMENTS WITH DECLARATIONS AND/OR EXHIBITS MUST BE**

5  **TABBED. CRC §3.1110(f)**

6  **ALL DEPOSITION EXCERPTS REFERENCED IN BRIEFS MUST BE MARKED**
   **ON THE TRANSCRIPTS ATTACHED AS EXHIBITS.   CRC §3.1116(c)**
7
8  *If your filing is not tabbed or depositions are not marked, do not file without the tabs or*
   *marked depositions unless today is the last day for filing.  If so, you must file a*
9  *tabbed/marked copy with the clerk in the department where your motion will be heard*
   *within 2 court days.*
10
11 **Chambers Copies Required**

12 8.     In addition to filing original motion papers in Room 102 of the Stanley Mosk

13 Courthouse, the parties must deliver, directly to the PI Court courtrooms, an extra copy

14 (marked "Chambers Copy") of reply briefs and all other motion papers filed less than seven

15 court days before a hearing calendared in the PI Courts.   The PI Courts also strongly

16 encourage the parties filing and opposing lengthy motions, such as motions for summary

17 judgment/adjudication, to submit one or more three-ring binders organizing the Chambers

18 Copies behind tabs.
19
20 **Reservation of Hearing Date**

21 9.     Parties are directed to reserve hearing dates for motions in the PI Courts using the

22 Court Reservation System (CRS) available online at *www.lacourt.org* (link on homepage).

23 After reserving a motion hearing date, the reservation requestor must submit the papers for

24 filing with the reservation receipt number printed on the face page of the document under the

25 caption and attach the reservation receipt as the last page. Parties or counsel who are unable
26
27

5                                              1/26/15

EXHIBIT  2  —  000032

1   to utilize the online CRS may reserve a motion hearing date by calling the PI Court

2   courtroom, Monday through Friday, between 3:00 p.m. and 4:00 p.m.

3   **Withdrawal of Motion**

4   10.       California Rules of Court, Rule 3.1304(b) requires a moving party to notify the court

5   immediately if a matter will not be heard on the scheduled date. In keeping with that rule, the

6
    PI Courts urge parties who amend pleadings in response to demurrers to file amended
7
    pleadings before the date when opposition to the demurrer is due so that the PI Courts do not
8
9   needlessly prepare tentative rulings on demurrers.

10  **Discovery Motions**

11  11.       The purpose of an Informal Discovery Conference ("IDC") is to assist the parties to

12  resolve and/or narrow the scope of discovery disputes.  Lead trial counsel on each side, or

13  another attorney with full authority to make binding agreements, must attend in person.  The

14
    PI judges have found that, in nearly every case, the parties amicably resolve disputes with the
15
    assistance of the Court.
16

17  12.       Parties **must** participate in an IDC **before** a Motion to Compel Further Responses to

18  Discovery will be heard, unless, the moving party submits evidence, by way of declaration,

19  that the opposing party has failed or refused to participate in an IDC.   Scheduling or

20  participating in an IDC does not extend any deadlines imposed by the Code of Civil

21  Procedure for noticing and filing discovery motions. Ideally, the parties should participate in

22  an IDC before a motion is filed because the IDC may avoid the necessity of a motion or

23  reduce its scope.  Because of that possibility, attorneys are encouraged to stipulate to extend

24
    the 45 (or 60) day deadline for filing a motion to compel further discovery responses in order
25
    to allow time to participate in an IDC.  If parties do not stipulate to extend the deadlines, the
26

27

6                                         1/26/15

EXHIBIT  2 – 000033

moving party may file the motion to avoid it being deemed untimely. However, the IDC must take place before the motion is heard so it is suggested that the moving party reserve a date for the motion hearing that is at least 60 days after the date when the IDC reservation is made. Motions to Compel Further Discovery Responses are heard at 10:00 a.m. If the IDC is not productive, the moving party may advance the hearing on a Motion to Compel Further Discovery Responses on any available hearing date that complies with the notice requirements of the Code of Civil Procedure.

13.     Parties are directed to reserve IDC dates in the PI Courts using CRS available online at *www.lacourt.org* (link on homepage). Parties are to meet and confer regarding the available dates in CRS prior to accessing the system. After reserving the IDC date, the reservation requestor must file in the appropriate department and serve an Informal Discovery Conference Form for Personal Injury Courts, form LACIV 239 (revised 12/14 or later), at least 15 court days prior to the conference and attach the CRS reservation receipt as the last page. The opposing party may file and serve a responsive IDC Form, briefly setting forth that party's response, at least 10 court days prior to the IDC.

14.     Time permitting, the PI Hub judges may be available to participate in IDCs to try to resolve other types of discovery disputes.

**Ex Parte Applications**

15.     Under the California Rules of Court, courts may only grant *ex parte* relief upon a showing, by admissible evidence, that the moving party will suffer "irreparable harm," "immediate danger," or where the moving party identifies "a statutory basis for granting relief ex parte." Cal. Rules of Court, Rule 3.1202(c). The PI Courts have no capacity to hear multiple *ex parte* applications or to shorten time to add hearings to their fully booked motion

1/26/15

EXHIBIT  2 - 000034

1  calendars.  The PI Courts do not regard the Court's unavailability for timely motion hearings

2  as an "immediate danger" or threat of "irreparable harm" justifying *ex parte* relief.  Instead of

3  seeking *ex parte* relief, counsel should reserve the earliest available motion hearing date, and

4  stipulate with all parties to continue the trial to a date thereafter using the Stipulation to

5  Continue Trial, FSC and Related Motion/Discovery Dates (form available on the court's

6  website, PI Court Tab).  Counsel should also check the CRS from time to time because

7  earlier hearing dates may become available as cases settle or counsel otherwise take hearings

8  off calendar.

9

10 **REQUEST FOR TRANSFER TO INDEPENDENT CALENDAR DEPARTMENT**

11 16.     Parties seeking to transfer a case from a PI Court to an Independent Calendar ("I/C")

12 Court shall file (in Room 102 of the Stanley Mosk Courthouse) and serve the Court's

13 "Motion to Transfer Complicated Personal Injury Case to Independent Calendar Court"

14 (form available on the Court's website, PI Courts link).  The PI Courts will transfer a matter

15 to an I/C Court if the case is not a "Personal Injury" case as defined in the General Order re

16 General Jurisdiction PI Cases, or if it is "complicated."  In determining whether a personal

17 injury case is "complicated", the PI Courts will consider, among other things, the number of

18 pretrial hearings or the complexity of issues presented.

19

20 17.     Parties opposing a motion to transfer have five court days to file (in Room 102) an

21 Opposition (using the same Motion to Transfer form).

22 18.     The PI Courts will not conduct a hearing on any Motion to Transfer to I/C Court.

23 Although the parties may stipulate to transfer a case to an Independent Calendar Department,

24 the PI Courts will make an independent determination whether to transfer the case or not.

25

26

27

                                        8                                    1/26/15

EXHIBIT  2 - 000035

**GENERAL ORDER – FINAL STATUS CONFERENCE**

19.     Parties shall comply with the requirements of the PI Courts' "Amended General Order – Final Status Conference," which shall be served with the summons and complaint.

**JURY FEES**

20.     Parties must pay jury fees no later than 365 calendar days after the filing of the initial complaint. (Code Civ. Proc., § 631, subds. (b) and (c).)

**JURY TRIALS**

21.     The PI Courts do not conduct jury trials. On the trial date, a PI Court will transfer the case to the Master Calendar Court in Department One in the Stanley Mosk Courthouse. Department One assigns cases out for trial to dedicated Trial Courts.

**SANCTIONS**

22.     The Court has discretion to impose sanctions for any violation of this general order. (C.C.P. §§ 128.7, 187 and Gov. Code, § 68608, subd. (b).)

Dated: JANUARY 26, 2015

Kevin C. Brazile
Supervising Judge, Civil
Los Angeles Superior Court

9                                                              1/26/15

EXHIBIT   2 – 000036

**FILED**
LOS ANGELES SUPERIOR COURT

**JAN 2 6 2015**

SHERRI R. CARTER, EXECUTIVE OFFICER/CLERK
C. Casares
BY C. CASAREZ, DEPUTY

1
2
3
4
5
6                 SUPERIOR COURT OF THE STATE OF CALIFORNIA
7            FOR THE COUNTY OF LOS ANGELES - CENTRAL DISTRICT
8
9   In re Personal Injury Cases Assigned to the   )   Case No.: _____
    Personal Injury Courts (Departments 91, 92,   )
10  93, and 97),                                    )   THIRD AMENDED GENERAL ORDER –
                                                    )   FINAL STATUS CONFERENCE,
11                                                  )   PERSONAL INJURY ("PI") COURTS
                                                    )   (Effective as of January 26, 2015)
12
13  The dates for Trial and Final Status Conference ("FSC") having been set in this matter, the Court
14  **HEREBY AMENDS AND SUPERSEDES ITS April 4, 2014 AMENDED GENERAL**
15  **ORDER – FINAL STATUS CONFERENCE AND GENERALLY ORDERS AS**
16  **FOLLOWS IN THIS AND ALL OTHER GENERAL JURISDICTION PERSONAL**
17  **INJURY ACTIONS:**
18
19      **1. PURPOSE OF THE FSC**
20          The purpose of the FSC is to verify that the parties/counsel are completely ready to
21  proceed with trial continuously and efficiently, from day to day, until verdict.  The PI Courts
22  will verify at the FSC that all parties/counsel have (1) prepared the Exhibit binders and Trial
23  Document binders and (2) met and conferred in an effort to stipulate to ultimate facts, legal
24  issues, motions *in limine*, and the authentication and admissibility of exhibits.
25

1/26/15

EXHIBIT 2 - 000037

## 2. TRIAL DOCUMENTS TO BE FILED

At least five calendar days prior to the Final Status Conference, the parties/counsel shall serve and file (in Room 102 of the Stanley Mosk Courthouse) the following Trial Readiness Documents:

### A.   TRIAL BRIEFS (OPTIONAL)

Each party/counsel may file, but is not required to file, a trial brief succinctly identifying:

> (1) the claims and defenses subject to litigation;
>
> (2) the major legal issues (with supporting points and authorities);
>
> (3) the relief claimed and calculation of damages sought; and
>
> (4) any other information that may assist the court at trial.

### B.   MOTIONS *IN LIMINE*

Before filing motions *in limine*, the parties/counsel shall comply with the statutory notice provisions of Code of Civil Procedure ("C.C.P.") Section 1005 and the requirements of Los Angeles County Court Rule ("Local Rule") 3.57(a). The caption of each motion *in limine* shall concisely identify the evidence that the moving party seeks to preclude. Parties filing more than one motion *in limine* shall number them consecutively. Parties filing opposition and reply papers shall identify the corresponding motion number in the caption of their papers.

### C.   JOINT STATEMENT TO BE READ TO THE JURY

For jury trials, the parties/counsel shall work together to prepare and file a joint written statement of the case for the court to read to the jury. Local Rule 3.25(i)(4).

1/26/15

EXHIBIT 2 - 000038

**D.    JOINT WITNESS LIST**

The parties/counsel shall work together to prepare and file a joint list of all witnesses that each

party intends to call (excluding impeachment and rebuttal witnesses).  Local Rule 3.25(i)(5).

The joint witness list shall identify each witness by name, specify which witnesses are experts,

and estimate the length of the direct, cross examination re-direct examination (if any) of each

witness.  The parties/counsel shall identify and all potential witness scheduling issues and special

requirements.  Any party/counsel who seeks to elicit testimony from a witness not identified on

the witness list must first make a showing of good cause.

**E.    LIST OF PROPOSED JURY INSTRUCTIONS (JOINT AND**
**        CONTESTED)**

The parties/counsel shall jointly prepare and file a list of proposed jury instructions, organized in

numerical order, specifying the instructions upon which all sides agree and the contested

instructions, if any. The Joint List of Jury Instructions must include a space by each instruction

for the judge to indicate whether the instruction was given.

**F.    JURY INSTRUCTIONS (JOINT AND CONTESTED)**

The parties/counsel shall prepare a complete set of full-text proposed jury instructions, editing all

proposed California Civil Jury Instructions for Judges and Attorneys ("CACI") instructions to

insert party names and eliminate blanks and irrelevant material. The parties shall prepare special

instructions in a format ready for submission to the jury with the instruction number, title and

text only (i.e., there should be no boxes or other indication on the printed instruction itself as to

the requesting party.)

1/26/15

EXHIBIT  2 - 000039

### G.    JOINT VERDICT FORM(S)

The parties/counsel shall prepare and jointly file a proposed general verdict form or special verdict form (with interrogatories) acceptable to all sides.  If the parties/counsel cannot agree on a joint verdict form, each party must separately file a proposed verdict form.  Local Rule 3.25(i)(7) and (8).

### H.    JOINT EXHIBIT LIST

The parties/counsel shall prepare and file a joint exhibit list organized with columns identifying each exhibit and specifying each party's evidentiary objections, if any, to admission of each exhibit.  To comply with Local Rules 3.52(i)(5) and 3.53, the parties shall meet and confer in an effort to resolve objections to the admissibility of each exhibit.

### 3.  EVIDENTIARY EXHIBITS

The parties/counsel shall jointly prepare (and be ready to temporarily lodge for inspection at the FSC), three sets of tabbed, internally paginated and properly-marked exhibits, organized numerically in three-ring binders (a set for the Court, the Judicial Assistant and the witnesses). The parties/counsel shall mark all non-documentary exhibits and insert a simple written description of the exhibit behind the corresponding numerical tab in the exhibit binder.

### 4.  TRIAL BINDERS REQUIRED IN THE PI COURTS

The parties/counsel shall jointly prepare (and be ready to temporarily lodge for inspection at the FSC) the Trial Documents, tabbed and organized into three-ring binders as follows:

Tab A: Trial Briefs

Tab B: Motions *in limine*

Tab C: Joint Statement to Be Read to the Jury

Tab D: Joint Witness List

1/28/15

EXHIBIT  2 - 000040

1    Tab E:  Joint List of Jury Instructions (identifying the agreed upon and contested

2    instructions)

3    Tab F:  Joint and Contested Jury Instructions

4    Tab G: Joint and/or Contested Verdict Forms

5    The parties shall organize motions *In limine* (tabbed in numerical order) behind tab B with

6    the opposition papers and reply papers for each motion placed directly behind the moving

7    papers.  The parties shall organize proposed jury instructions behind tab F, with the agreed upon

8    instructions first in order followed by the contested instructions (including special instructions)

9    submitted by each side.

10   **5.  FAILURE TO COMPLY WITH FSC OBLIGATIONS**

11   The court has discretion to require any party/counsel who fails or refuses to comply with this

12   General Order to Show Cause why the court should not impose monetary, evidentiary and/or

13   issue sanctions (including the entry of a default or the striking of an answer).

14
15
16                              Dated this 26th day of January, 2015

17                              Kevin C. Brazile
18                              Supervising Judge, Civil
                                Los Angeles Superior Court
19
20
21
22
23
24
25

1/26/15

EXHIBIT  2 — 000041

COPY

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

JUN 0 8 2015

Sherri R. Carter, Executive Officer/Clerk
By Shaunya Bolden, Deputy

1  DOYLE LOWTHER LLP
   William J. Doyle II (SBN 188069)
2  James R. Hail (SBN 202439)
   Chris W. Cantrell (SBN 290874)
3  10200 Willow Creek Road, Suite 150
   San Diego, CA 92131
4  Tel: (858) 935-9960
   Fax: (858) 939-1939
5

6  *Attorneys for Plaintiff Timms*

7

8          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              IN AND FOR THE COUNTY OF LOS ANGELES

10 VIKKI TIMMS,                           Case No.:

11              Plaintiff,                COMPLAINT           BC 5 8 4 4 4 4

12      v.

13 DEPUY ORTHOPAEDICS, INC.;
   DEPUY, INC.; JOHNSON & JOHNSON;        **Jury Trial Demanded**
14 Thomas Schmalzried, M.D., Thomas P.
   Schmalzried, M.D. A Professional
15 Corporation, and DOES 1 through 20,
   inclusive,
16
17          Defendants.

18                        **INTRODUCTION**

19      1.      This products liability lawsuit arises from the failure of the DePuy Pinnacle

20 prosthetic hip implant device, composed of an acetabular cup, ball and insert (collectively

21 referred to herein as the "Pinnacle Hip"). The Pinnacle Hip is used to replace a patient's natural

22 hip joint as a result of disease, deterioration, or fracture of that joint. The hip joint,

23 scientifically referred to as the acetabulofemoral joint, is the joint between the femur (the thigh

24 bone) and the acetabulum (the hip socket) of the pelvis, and its primary function is to support

25 the weight of the body in both static (i.e. standing) and dynamic (i.e. walking or running)

26 postures. Defendants have developed, manufacturer, promoted, distributed and sold the

27 Pinnacle Hip since 2001, during which time Defendants repeatedly concealed aberrantly high

28

                              COMPLAINT

BY FAX

EXHIBIT  2 — 000042

1   failure rates. Defendants still have not recalled the Pinnacle Hip.

2       2.    Plaintiff Vikki Timms was implanted with the Pinnacle Hip. After the device was

3   sold to Plaintiff and implanted in her body, it failed as alleged below.

4       3.    Data and information that only recently became commonly known and publically

5   available demonstrate that the Pinnacle Hip has extraordinarily high rates of loosening, failure

6   and release of dangerous metal debris which caused Plaintiff and other patients like her to

7   develop complications necessitating removal of the Pinnacle Hip device in "revision"

8   surgeries. A revision surgery is a painful procedure during which some or all of the Pinnacle

9   Hip components are explanted from the patient's body and replaced with new components.

10  Plaintiff alleges that problems and defects with the Pinnacle Hip, and Defendants' other acts

11  and omissions, some of which are presently unknown to Plaintiff, were the cause of the failure

12  of Plaintiff Vikki Timms's Pinnacle hip.

13      4.    Before the date of Plaintiff's initial hip surgery, Defendants knew, and had reason

14  to know, that the Pinnacle Hip was defective and presented abnormally high risks of early

15  failure, and that it caused other complications following implantation. Despite both actual and

16  constructive notice of such problems and defects, Defendants continue to market, sell, promote

17  and defend the defective device. Defendants failed to warn the medical community and

18  patients including Plaintiff, of the unnecessary and unacceptable risks posed by the utilization

19  of the Pinnacle Hip, when there were other available hip implant systems that were safer and

20  would have served the same purpose. Instead, Defendants unlawfully concealed the dangerous

21  problems associated with implantation on the Pinnacle Hip. As a result, Plaintiff Vikki Timms

22  was implanted with a defective device, resulting in painful and dangerous complications, and

23  has had to undergo unnecessary and additional surgeries, causing pain and suffering, and

24  causing Plaintiff to suffer losses and injuries which are permanent in nature.

25                          **JURISDICTION AND VENUE**

26      5.    This Court has jurisdiction over all causes of action asserted herein. Each

27  Defendant has sufficient minimum contacts in California or otherwise intentionally avails itself

28

2
COMPLAINT

EXHIBIT  2  —  000043

Case 2:15-cv-05253-AB-JPR   Document 1   Filed 07/13/15   Page 46 of 74   Page ID #:46

of the California market through, without limitation, its advertisement, promotion, marketing, sales and/or distribution and other business activities, so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

6.     Venue is proper in Los Angeles County under Code of Civil Procedure Section 395(a) based on facts, without limitation, that: this Court is a court of competent jurisdiction; a substantial part of the events or omissions giving rise to this action occurred in this county; all Defendants conduct substantial business in this county including the advertisement, promotion, marketing, sales and/or distribution of the defective Pinnacle Hip; and a portion of Defendants' liability arose in this county; and a substantial part of the events or omissions giving rise to this action occurred in this county.

7.     Plaintiff Vikki Timms is an adult resident and citizen of Riverside County, California. Plaintiff Timms received a Pinnacle Hip system during a right total hip arthroplasty at Redlands Community Hospital in Redlands, California. After experiencing right hip pain, it was discovered that the acetabular cup was separating. In April 2014, Plaintiff underwent a revision procedure where the old Pinnacle implant was removed and a new artificial hip implanted.

8.     Defendant DePuy Orthopaedics, Inc. is a corporation organized and existing under the laws of the State of Indiana, with its principal place of business located at 700 Orthopaedic Drive, Warsaw, IN 46581. Defendant DePuy Orthopaedics, Inc. is a wholly-owned subsidiary of Defendant Johnson & Johnson. At all times relevant to this action, Defendant DePuy Orthopaedics has conducted business in the County of Los Angeles, State of California and generated revenue as a result.

9.     Defendant DePuy, Inc. is a corporation existing under the laws of the State of Indiana. Defendant DePuy, Inc. is a subsidiary of Defendant Johnson & Johnson. Defendant DePuy, Inc. maintains its principal place of business at 700 Orthopaedic Drive, Warsaw, Indiana 46581. At all times relevant, DePuy conducted business within the State of California and generated revenue as a result.

COMPLAINT

EXHIBIT  2 — 000044

10.   Defendant Johnson & Johnson is a corporation organized and existing under the laws of the state of New Jersey, with its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, NJ 08933. Defendant Johnson & Johnson is the parent company of Defendants Johnson & Johnson Services, Inc.; DePuy Orthopaedics, Inc.; and De Puy, Inc. at all times relevant to this action, Defendant Johnson & Johnson has conducted business in the County of Los Angeles, California and generated substantial revenue in this State.

11.   Defendant Johnson & Johnson Services, Inc. is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, NJ 08933. Defendant Johnson & Johnson Services, Inc. has conducted business in the County of Los Angeles, State of California.

12.   DePuy Orthopaedics, Inc.; Depuy, Inc.; Johnson & Johnson Services, Inc.; and Johnson & Johnson (hereinafter, collectively, "DePuy") developed, manufactured, advertised, promoted, marketed, sold and/or distributed the defective DePuy Pinnacle Hip throughout the United States, and in the State of California.

13.   Defendant Thomas Schmalzried, M.D. (hereafter "Dr. Schmalzried") is an individual. Plaintiff is informed and believes and therefore alleges that Dr. Schmalzried is a resident and citizen of Los Angeles County, State of California.

14.   On information and belief, Defendant Thomas P. Schmalzried, M.D. A Professional Corporation ("TPS Corp.") is a corporation organized and existing under the laws of California with its primary place of business in Los Angeles, California. TPS Corp. designed the hip implant that is the subject of this lawsuit. Plaintiff is informed and believes, and on that basis alleges that Dr. Schmalzried owns and controls TPS Corp., and that a primary purpose of TPS Corp. is to collect royalty payments and consulting fees on behalf of Dr. Schmalzried that arise directly from the sale of the defective and dangerous Pinnacle Hip. In the last two years alone, TPS Corp. has collected more than $3.4 million in royalty payments from DePuy.

15.   The true names and capacities of Does 1 through 20 are unknown to Plaintiff. Plaintiff is informed and believes and thereon alleges that each of these Defendants is in some

4
COMPLAINT

EXHIBIT  2 - 000045

1  way liable for the events referred to in this Complaint and caused damage to Plaintiff. Plaintiff
2  will amend this Complaint and insert the correct names and capacities of those Defendants when
3  they are discovered.

4      16.   DePuy, TPS Corp., Dr. Schmalzried, and DOES 1 through 20 are collectively
5  referred to herein as "Defendants."

6  <div align="center">CIVIL CONSPIRACIES/CONCERTED ACTIONS</div>

7      17.   At all times herein mentioned, Defendants, both individually and collectively, and
8  affiliates not herein named, are and were agents or joint venturers of each other, and in doing the
9  acts alleged herein were acting within the course and scope of such agency. Each of these
10  Defendants had actual and/or constructive knowledge of the acts of each other, and ratified,
11  approved, joined in, acquiesced in, and/or authorized the wrongful acts of each other and/or
12  retained the benefits of said wrongful acts.

13      18.   At all times relevant to the matters alleged in this Complaint, Defendants each
14  acted as the agent of the other Defendants, within the course and scope of this agency
15  relationship regarding the acts and omissions alleged. Together these Defendants entered into an
16  agreement to commit the acts alleged herein, and engaged in the course of conduct and in
17  furtherance of those goals. These Defendants acted in concert, aided and abetted each other,
18  conspired to engage in the common course of misconduct alleged herein for the purpose of
19  enriching themselves at the expense of Plaintiff.

20  <div align="center">THE DEPUY PINNACLE HIP SYSTEM</div>

21      19.   The hip joint is where the femur connects to the pelvis. The joint is made up of
22  the femoral head (a ball-like structure at the very top of the femur) rotating within the
23  acetabulum (a cup-like structure at the bottom of the pelvis). In a healthy hip, both the femur and
24  the acetabulum are strong and the rotation of the bones against each other is cushioned and
25  lubricated by cartilage and fluids.

26      20.   A total hip replacement replaces the body's natural joint with an artificial one,
27  usually made out of metal and plastic. A typical total hip replacement system consists of four
28

<div align="center">5<br>COMPLAINT</div>

EXHIBIT 2 - 000046

1 | separate components: (1) a femoral stem; (2) a femoral head; (3) a liner; and (4) an acetabular
2 | shell. After the surgeon hollows out a patient's femur bone, the femoral stem is implanted. The
3 | femoral head is a metal ball that is fixed on top of the femoral stem. The femoral head forms the
4 | hip joint when it is placed inside the liner and acetabular shell.

5 |      21.    The Pinnacle Hip is a Class III medical device. Class III devices are those that
6 | operate to sustain human life, are of substantial importance in preventing impairment of human
7 | health, or pose potentially unreasonable risks to patients.

8 |      22.    The Medical Device Amendments to the Food, Drug, and Cosmetics Act of 1938
9 | ("MDA"), in theory, require Class III medical devices, including the Pinnacle Hip, to undergo
10 | premarket approval by the FDA, a process which obligates the manufacturer to design and
11 | implement a clinical investigation and to submit the results of that investigation to the FDA.

12 |      23.    Premarket approval is a rigorous process that requires a manufacturer to submit
13 | what is typically a multivolume application that includes, among other things, full reports of all
14 | studies and investigations of the device's safety and effectiveness that have been published or
15 | should reasonably be known to the applicant; a full statement of the device's components,
16 | ingredients, and properties and of the principle or principles of operation; a full description of the
17 | methods used in, and the facilities and controls used for, the manufacture, processing, and, when
18 | relevant, packing and installation of, such device; samples or device components required by the
19 | FDA; and a specimen of the proposed labeling.

20 |      24.    The FDA may grant premarket approval only if it finds that there is reasonable
21 | assurance that the medical device is safe and effective and must weigh any probable benefit to
22 | health from the use of the device against any probable risk of injury or illness from such use.

23 |      25.    A medical device on the market prior to the effective date of the MDA—a so-
24 | called "grandfathered" device—was not required to undergo premarket approval.

25 |      26.    In addition, a medical device marketed after the MDA's effective date may
26 | bypass the rigorous premarket approval process if the device is "substantially equivalent" to a
27 | "grandfathered pre-MDA device (i.e., a device approved prior to May 28, 1976). This exception
28 |

6
COMPLAINT

EXHIBIT  2 - 000047

to premarket approval is known as the "510(k)" process and simply requires the manufacturer to notify the FDA under section 510(k) of the MDA of its intent to market a device at least 90 days prior to the device's introduction on the market, and to explain the device's substantial equivalence to a pre-MDA predicate device. The FDA may then clear the new device for sale in the United States.

27.   The MDA does not require an FDA determination that the device is in fact substantially equivalent to a grandfathered device.

28.   Instead of assuring the safety of the Pinnacle Hip through clinical trials, DePuy sought to market its Pinnacle Hip without conducting any clinical trials by obtaining FDA approval under section 510(k). To that end, Defendants submitted a section 510(k) premarket notification of intent to market the Pinnacle Hip.

29.   By telling the FDA that the Pinnacle Hip's design was "substantially equivalent" to other hip products on the market, DePuy was able to avoid the safety review required for premarket approval under FDA regulations including clinical trials.

30.   The FDA cleared the Pinnacle Hip for sale by means of the abbreviated 510(k) process and consequently, the FDA did not require the Pinnacle Hip to undergo clinical trials.

31.   The 510(k) notification for the Pinnacle Hip includes only Defendant DePuy's assertion that it believes the Pinnacle Hip to be substantially equivalent to devices that themselves had never been reviewed for safety and effectiveness.

32.   Unlike the premarket approval process, the 510(k) notification process does not call for scrutiny—or even clinical testing—of a device's safety and effectiveness.

33.   A finding of substantial equivalence is not equivalent to a finding of a device's safety and effectiveness. This point is underscored by the FDA's 510(k) approval letter to DePuy, which says nothing about the safety and effectiveness of the Pinnacle Hip; finds only that the device was "substantially equivalent to devices introduced into interstate commerce prior to May 28, 1976"; and concludes by stressing that the agency's determination of substantial equivalence "does not mean that FDA has made a determination that your device complies with other

EXHIBIT 2 - 000048

1    requirements of the Act or any Federal statutes and regulations administered by other Federal

2    agencies."

3        34.    Thus, the FDA's finding of "substantial equivalence" had nothing to do with

4    reviewing the Pinnacle Hip's safety and effectiveness, but rather was only a determination of its

5    equivalence to devices that themselves underwent no safety and effectiveness review.

6        35.    The Pinnacle Hip suffers from a design or manufacturing defect, similar to that

7    which forced DePuy to recall over 93,000 metal-on-metal ASR and ASR XL hip implants.

8        36.    It was not long after DePuy launched the Pinnacle Hip that failure reports began

9    flooding into DePuy. DePuy received a complaint that a patient had to undergo a surgery to

10    remove and replace the hip implant because the liner disassociated with the cup. DePuy closed

11    its investigation of this complaint, finding that "corrective action is not indicated." DePuy

12    received another report that another patient had to undergo surgery to remove and replace a

13    defective hip implant because the acetabular cup had loosened. Again, DePuy closed its

14    investigation of this complaint, finding that "corrective action is not indicated."

15        37.    DePuy would go on to receive hundreds of similar complaints reporting that the

16    Pinnacle Hip had failed due to premature loosening of the acetabular cup and that the failure had

17    forced patients to undergo painful and risky surgeries to remove and replace the failed hip

18    component.

19        38.    By the time DePuy sold the Pinnacle Hip to Plaintiff Vicki Timms, DePuy had

20    received hundreds of complaints related to the Pinnacle Hip. Consequently, DePuy was fully

21    aware that the Pinnacle Hip was defective. Based on this information, DePuy should have

22    recalled the Pinnacle Hip before it was sold to Ms. Timms. At minimum, DePuy should have

23    stopped selling the defective implant when it became aware that it had catastrophically failed in

24    several patients.

25        39.    In the years following the Pinnacle's release, reports of Pinnacle Hip failures were

26    flooding into DePuy. By the end of 2008, DePuy had received more than 430 reports and by the

27    end of 2009, that number had skyrocketed to almost 750.

28

<div align="center">8

COMPLAINT</div>

EXHIBIT 2 - 000049

40.    Despite its knowledge that the Pinnacle Hip was defective and that it had failed hundreds of times, causing hundreds of patients to undergo the agony of another surgery, DePuy continued to market and sell the defective hip implant. In so doing, DePuy actively concealed the known defect from doctors and patients-including Ms. Timms and her doctor, and misrepresented the Pinnacle Hip was a safe and effective medical device.

41.    TPS Corp. remained actively involved in promoting and marketing the Pinnacle Hip. TPS Corp., by and through its shareholder, director, and officer, Defendant Dr. Thomas Schmalzried, was a "product champion" for the Pinnacle Hip. In the orthopedics community, a "product champion" uses his reputation as a prominent orthopedic surgeon to encourage other orthopedic surgeons to use a new product. In his role as a "product champion" for the Pinnacle Hip, Dr. Schmalzried, on behalf of TPS Corp., made representations to orthopedic surgeons that the Pinnacle Hip was safe and effective. Although it knew or should have known about defects in the Pinnacle Hip at the time the Pinnacle Hip was sold to Plaintiff, TPS Corp. did not disclose that information to Plaintiff or Plaintiff's doctors, despite a legal duty to do so. Instead, TPS Corp. actively concealed mounting problems with the Pinnacle Hip, and deflected blame for the mounting failures by blaming the surgical technique of the implanting orthopedic surgeon.

42.    DePuy had financial incentives to conceal the defects of its Pinnacle Hip. In 2009 alone, DePuy brought in more than $5.4 billion in total sales. Hip implant sales are critically important to DePuy's parent company, Johnson & Johnson, and DePuy is one of Johnson & Johnson's most profitable business groups. When DePuy was faced with a critical defect in its ASR hip implant system, DePuy had financial incentives to conceal evidence that another of its popular hip products—the Pinnacle Hip—had critical defects that could cause premature failure, forcing patients to undergo another painful surgery. Focused on corporate profits, and at the expense of patient safety, DePuy decided not to issue an embarrassing recall when it learned of the defects with its Pinnacle Hip.

43.    Defendants had legal and moral obligations to stop promoting, marketing, selling and defending the Pinnacle Hip. Defendants should have instead notified physicians who had

9
COMPLAINT

EXHIBIT  2 - 000050

1  implanted the Pinnacle Hip of the device's propensity to fail, and for some patients to develop

2  extremely adverse reactions to the high level of metal debris generated by normal use of the

3  device. Defendants should have attempted to convey this same information to patients who had

4  been implanted with the Pinnacle Hip. Nonetheless, Defendants did not notify doctors or patients

5  of the risks the device presented. Instead, Defendants concealed this material information, while

6  continuing to market, promote, defend, sell and distribute the product. To this day, DePuy

7  continues to sell these defective implants to unsuspecting patients without any warning about the

8  risks or the failures that have been reported to the company.

9                              **PLAINTIFF VIKKI TIMMS**

10        44.    Plaintiff Vikki Timms underwent a right total hip replacement procedure using

11  the Pinnacle Hip at Redlands Community Hospital in Redlands, California. As a result of the

12  defective design, manufacture, and composition of this device, and its inadequate accompanying

13  warnings and instructions, the Pinnacle Hip failed, causing Plaintiff to suffer serious physical

14  injuries, including but not limited to, severe hip pain, which inhibited Plaintiff's ability to walk

15  and engage in physical and social activities she used to enjoy.

16        45.    Plaintiff's right hip was surgically revised on or about April 14, 2014 after the

17  acetabular cup separated or loosened.

18        46.    As a direct and legal consequence of the failure of the Pinnacle Hip, and its

19  defects as described herein, Plaintiff Vikki Timms suffered the injuries, losses, and damages

20  herein claimed.

21        47.    Ms. Timms now faces greater risk of future complications because she was

22  required to undergo a hip revision surgery. Several studies have found that one revision surgery

23  creates a much higher risk of hip dislocation than an original hip replacement surgery. In one

24  study conducted by Charlotte Phillips and her colleagues at Brigham and Women's Hospital in

25  Boston, 14.4 percent of patients who underwent revision surgery suffered from a dislocation,

26  compared with 3.9 percent of patients who only underwent an original hip replacement surgery.

27  In other words, hip replacement patients who have undergone a revision surgery are almost four

28
                                    10
                                 COMPLAINT

EXHIBIT   2 - 000051

times more likely to suffer from hip dislocation than those who have not. (Phillips, C.B., et al., Incidence rates of dislocation, pulmonary embolism, and deep infection during the first six months after elective total hip replacement, AMERICAN JOURNAL OF BONE AND JOINT SURGERY 2003; 85:20-26).

### FIRST CAUSE OF ACTION
### (Strict Liability – Manufacturing Defect)

48.     Plaintiff hereby incorporates by reference all previous paragraphs, as though alleged fully in this Cause of Action.

49.     Prior to, on, and after the date of Plaintiff's initial hip surgery, and at all relevant times, Defendants designed, distributed, manufactured, sold, and marketed the Pinnacle Hip for implantation into consumers, such as Plaintiff Vikki Timms, by physicians and surgeons in the United States.

50.     At all times herein mentioned, the Defendants designed, distributed, manufactured, marketed and sold the Pinnacle Hip, which was implanted in Plaintiff, such that it was dangerous, unsafe, and defective in manufacture. Said defects included, but were not limited to, the fact that the Pinnacle Hip's acetabular cup had a tendency to detach, disconnect, and/or loosen from a patient's acetabulum, cause pain, inhibit walking, and require revision surgery. These defects also caused the Pinnacle Hip to generate dangerous and harmful levels of metal debris in the patient's body.

51.     Plaintiff is informed and believes and on that basis alleges that the Pinnacle Hip implanted in Plaintiff Vickie Timms contained a manufacturing defect, in that it differed from the manufacturer's design or specifications, or from other typical units of the same product line.

52.     Plaintiff's physicians employed the Pinnacle Hip in the manner in which the Pinnacle Hip was intended to be used, making such use reasonably foreseeable to Defendants.

53.     As alleged above, Defendants knew and had reason to know that the Pinnacle Hip caused increased risk of harm to the Plaintiff and other consumers like her. Defendants consciously disregarded this increased risk of harm by failing to warn of such risks; unlawfully

11
COMPLAINT

EXHIBIT   2  –  000052

1   concealing the dangerous problems associated with implantation of the Pinnacle Hip; and
2   continuing to market, promote, sell and defend the Pinnacle Hip.

3          54.    As a direct and proximate result of Defendants' design, manufacture, marketing,
4   and sale of the Pinnacle Hip prior to, on, and after the date of Plaintiff's initial hip surgery,
5   Plaintiff suffered the injuries herein described.

6          55.    Defendants' design, manufacture, marketing, promotion, defense and sale of the
7   Pinnacle Hip was a substantial factor in causing Plaintiff's injuries, as described herein.

8          56.    As a direct and legal result of Defendants' design, distribution, manufacture,
9   marketing, and sale of the Pinnacle Hip, Plaintiff Vikki Timms suffered acetabular cup
10  detachment, disconnection, and/or loosening, pain, other injuries presently undiagnosed, and has
11  undergone unnecessary and additional surgery.

12         57.    As a direct and legal result of these injuries, it became necessary for Plaintiff to
13  incur expenses for doctors, hospitals, surgeries, nurses, and other reasonably required and
14  medically necessary supplies and services, which said services are still continuing. Plaintiff prays
15  for leave to amend this Complaint to insert these elements of damage when the same are finally
16  determined.

17         58.    As a direct and legal result thereof of these injuries, Plaintiff has suffered and
18  sustained general (non-economic) damages in a sum in excess of the minimum jurisdictional
19  limits of this Court.

20                           SECOND CAUSE OF ACTION
21                          (Strict Liability – Failure to Warn)

22         59.    Plaintiff hereby incorporates by reference all previous paragraphs, as though
23  alleged fully in this Cause of Action.

24         60.    Prior to, on, and after the date of Plaintiff's initial hip surgery, and at all relevant
25  times, Defendants manufactured, distributed, and sold the Pinnacle Hip for implantation into
26  consumers, such as Plaintiff Vikki Timms, by physicians and surgeons in the United States.

27         61.    The Pinnacle Hip posed increased risks of harm and side effects that were known

28                                    12

EXHIBIT  2 – 000053

1 | or knowable to Defendants by the use of scientific knowledge available before, at and after the
2 | time of manufacture, distribution, and sale of the Pinnacle Hip. Defendants knew or should have
3 | known of the defective condition, characteristics, and risks associated with said product, as
4 | previously set forth herein. Defendants consciously disregarded this increased risk of harm by
5 | failing to warn of such risks; unlawfully concealing the dangerous problems associated with
6 | implantation of the Pinnacle Hip; and continuing to market, promote, sell and defend the
7 | Pinnacle Hip.

8 |      62.    The Pinnacle Hip that was manufactured, distributed, and sold by the Defendants
9 | to Plaintiff was in a defective condition that was unreasonably and substantially dangerous to any
10 | users or ordinary consumers of the device, such as Plaintiff. Such ordinary consumers, including
11 | Plaintiff, would not and could not have recognized or discovered the potential risks and side
12 | effects of the Pinnacle Hip as set forth herein.

13 |      63.    The warnings and directions provided with the Pinnacle Hip by Defendants failed
14 | adequately to warn of the potential risks and side effects of the Pinnacle Hip and the dangerous
15 | propensities of said medical device, which risks were known or were reasonably scientifically
16 | knowable to Defendants.

17 |      64.    Defendants' Pinnacle Hip components were expected to and did reach Plaintiff
18 | and her physicians without substantial change in their condition as manufactured, distributed,
19 | and sold by Defendants. Additionally, Plaintiff's physicians used the Pinnacle Hip in the manner
20 | in which the Pinnacle Hip was intended to be used, making such use reasonably foreseeable to
21 | Defendants.

22 |      65.    As a direct and proximate result of Defendants' manufacture, distribution, and
23 | sale of the Pinnacle Hip, Plaintiff suffered the injuries, losses and damages herein described.

24 |      66.    Defendants' lack of sufficient instructions or warnings prior to, on, and after the
25 | date of Plaintiff's initial hip surgery was a substantial factor in causing Plaintiff's injuries, losses
26 | and damages, as described herein.

27 |                            **THIRD CAUSE OF ACTION**

28 |

<center>13</center>
<center>COMPLAINT</center>

EXHIBIT 2 - 000054

(Negligence – Design, Manufacture and Sale)

67.    Plaintiff hereby incorporates by reference all previous paragraphs, as though alleged fully in this Cause of Action.

68.    Prior to, on, and after the date of Plaintiff's initial hip surgery, and at all relevant times, Defendants designed, tested, distributed, manufactured, advertised, sold, and marketed the Pinnacle Hip for implantation into consumers, such as Plaintiff Vikki Timms, by physicians and surgeons in the United States.

69.    Prior to, on, and after the date of Plaintiff's initial hip surgery, Defendants were negligent and careless in and about their design, testing, distribution, manufacture, advertising, sale and marketing of the above-described Pinnacle Hip.

70.    Prior to, on, and after the date of Plaintiff's initial hip surgery, Defendants failed to perform adequate evaluation and testing of the Pinnacle Hip, where such adequate evaluation and testing would have revealed the propensity of the Pinnacle Hip's acetabular cup to detach, disconnect, and/or loosen from the acetabulum, and to cause pain, inhibition of the ability to walk, and to require revision surgery.

71.    Prior to, on, and after the date of Plaintiff's initial hip surgery, Defendants had received complaints from healthcare providers that the Pinnacle Hip caused serious complications including detachment, disconnection, creation of metallic debris and/or loosening of the acetabular cup from the acetabulum, but Defendants nonetheless consciously decided not to: perform any further testing on the Pinnacle Hip; investigate the root cause of these complications; suspend sales and distribution; or warn physicians and patients of the propensity of the device's acetabular cup to detach, disconnect, and/or loosen from the acetabulum.

72.    As a direct and proximate result of the above-described negligence in design, testing, distribution, manufacture, advertising, sales and marketing, Plaintiff suffered the injuries, losses and damages herein described.

73.    Defendants' negligence in design, testing, distribution, manufacture, advertising, sales, and marketing prior to, on, and after the date of Plaintiff's initial hip surgeries was a

14
COMPLAINT

EXHIBIT   2 – 000055

1  substantial factor in causing Plaintiff's injuries, losses, and damages, as described herein.

2  74.    As alleged above, Defendants knew and had reason to know that the Pinnacle Hip

3  caused increased risk of harm to the Plaintiff and other consumers like her. Defendants caused

4  increased risk of harm to the Plaintiff and other consumers like her. Defendants concealed the

5  dangerous problems associated with implantation of the Pinnacle Hip; and continuing to market,

6  promote, sell and defend the Pinnacle Hip.

7
                                  **FOURTH CAUSE OF ACTION**
8                             **(Negligence-Failure to Recall/Retrofit)**

9  75.    Plaintiff hereby incorporates by reference all previous paragraphs, as though

10 alleged fully in this Cause of Action.

11 76.    Prior to, on, and after the date of Plaintiff's initial hip surgery, and at all relevant

12 times, Defendants designed, distributed, manufactured, sold, and marketed the Pinnacle Hip for

13 implantation into consumers, such as Plaintiff Vikki Timms, by physicians and surgeons in the

14 United States.

15 77.    Prior to, on, and after the date of Plaintiff's initial hip surgery, Defendants knew

16 or reasonably should have known that the Pinnacle Hip and its warnings were dangerous or were

17 likely to be dangerous when used in a reasonably foreseeable manner.

18 78.    Prior to, on, and after the date of Plaintiff's initial hip surgery, Defendants became

19 aware of the defects of the Pinnacle Hip, including the propensity of its acetabular cup to detach,

20 disconnect, and/or loosen from the acetabulum.

21 79.    Defendants failed to recall or warn patients or physicians about the danger of the

22 device prior to, on, and after the date of Plaintiff's initial hip surgery.

23 80.    In light of the severity and number of the complaints transmitted to Defendants

24 and the additional available data, reasonable manufacturers and distributors under the same or

25 similar circumstances would have recalled the Pinnacle Hip well in advance of the date of

26 Plaintiff's initial hip surgery, and would thereby have avoided and prevented harm to hundreds

27 or thousands of patients, including Plaintiff.

28
                                           15
                                        COMPLAINT

EXHIBIT 2 - 000056

81.     As a direct and proximate result of the above-described negligent failure to recall the Pinnacle Hip, Plaintiff suffered the injuries, losses and damages herein described.

82.     Defendants' negligent failure to recall the Pinnacle Hip was a substantial contributing factor in causing Plaintiff's injuries, losses and damages, as described herein.

83.     As alleged above, Defendants knew and had reason to know that the Pinnacle Hip caused increased risk of harm to the Plaintiff and other consumers like her. Defendants consciously disregarded this increased risk of harm by failing to warn of such risks; unlawfully concealing the dangerous problems associated with implantation of the Pinnacle Hip; and continuing to market, promote, sell and defend the Pinnacle Hip.

### FIFTH CAUSE OF ACTION
#### (Negligence – Failure to Warn)

84.     Plaintiff hereby incorporates by reference all previous paragraphs, as though alleged fully in this Cause of Action.

85.     Prior to, on, and after the date of Plaintiff's initial hip surgery, and at all relevant times, Defendants designed, distributed, manufactured, sold, and marketed the Pinnacle Hip for implantation into consumers, such as Plaintiff Vikki Timms, by physicians and surgeons in the United States.

86.     Prior to, on, and after the dates of Plaintiff's initial hip surgery, Defendants knew or should have known that the Pinnacle Hip was dangerous or was likely to be dangerous when used in a reasonably foreseeable manner. Such danger included the propensity of the device's acetabular cup to detach, disconnect, and/or loosen from a patient's acetabulum, cause pain, inhibit walking, and require revision surgery.

87     Prior to, on, and after the dates of Plaintiff's initial hip surgery, Defendants knew or reasonably should have known that the users of the device, including Plaintiff, would not realize the dangers presented by the device.

88.     Prior to, on, and after the date of Plaintiff's initial hip surgery, Defendants failed to adequately warn of the dangers presented by the device and/or failed to instruct on the safe use

16
COMPLAINT

EXHIBIT  2 – 000057

1  of the device. Such failures to warn and/or instruct included, but were not limited to: failing to

2  advise of the known or knowable risks, dangers, and side effects associated with the use of the

3  Pinnacle Hip; failing to properly advise of the means and methods available for the elimination

4  of the risks, dangers, and side effects associated with the Pinnacle Hip, including acetabular cup

5  detachment, disconnection, and/or loosening from the acetabulum; failing to warn physicians

6  about the risks, dangers, and side effects associated with the Pinnacle Hip, including the rate of

7  acetabular cup detachment, disconnection, and/or loosening from the acetabulum, as well as

8  associated complications; and failing to warn consumers about the risks, dangers, and side

9  effects associated with the Pinnacle Hip, including the rate of acetabular cup detachment,

10 disconnection, and/or loosening from the acetabulum, as well as associated complications, and

11 the signs and symptoms of detachment, disconnection, loosening and/or associated complications

12 for which medical attention should be sought.

13      89.     Reasonable manufacturers and reasonable distributors, under the same or similar

14 circumstances as those of Defendants prior to, on, and after the date of Plaintiff's initial hip

15 surgery, would have warned of the dangers presented by the Pinnacle Hip, or instructed on the

16 safe use of the Pinnacle Hip.

17      90.     Prior to the date of Plaintiff's initial hip surgery, the Pinnacle Hip had already

18 caused numerous instances of the acetabular cup becoming detached, disconnected, and/or

19 loosened from patients' acetabulum. Defendants consciously decided neither to warn physicians

20 or patients of the Pinnacle Hip's increased propensity to cause these serious complications, nor

21 of the signs and symptoms of these complications.

22      91.     Defendants' negligent failure to warn Plaintiff or Plaintiff's medical care

23 providers prior to, on, and after the date of Plaintiff Vikki Timms's initial hip surgery was a

24 substantial factor in causing Plaintiff's injuries, losses and damages as described herein.

25      92.     As alleged above, Defendants knew and had reason to know that the Pinnacle Hip

26 caused increased risk of harm to the Plaintiff and other consumers like her. Defendants

27 consciously disregarded this increased risk of harm by failing to warn of such risks; unlawfully

28

17
COMPLAINT

EXHIBIT  2 - 000058

1  concealing the dangerous problems associated with implantation of the Pinnacle Hip; and
2  continuing to market, promote, sell and defend the Pinnacle Hip.

### SIXTH CAUSE OF ACTION
### (Breach of Implied Warranty)

93.    Plaintiff hereby incorporates by reference all previous paragraphs, as though
alleged fully in this Cause of Action.

94.    Defendants impliedly warranted that the Pinnacle Hip, which Defendants
designed, manufactured, assembled, promoted and sold to Plaintiff Vikki Timms and Plaintiff's
physicians, was merchantable and fit and safe for ordinary use.

95.    Defendants further impliedly warranted that the Pinnacle Hip, which Defendants
designed, manufactured, assembled, promoted and sold to Plaintiff and Plaintiff's physicians,
was fit for the particular purposes for which it was intended and was sold.

96.    Contrary to these implied warranties, the Pinnacle Hip was defective,
unmerchantable, and unfit for its ordinary use when sold, and unfit for the particular purpose for
which it was sold.

97    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has
sustained and will continue to sustain severe physical injuries, severe emotional distress, mental
anguish, economic losses and other damages. As a direct result, Plaintiff expended money and
will continue to expend money for medical bills and expenses. Plaintiff is entitled to
compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

### SEVENTH CAUSE OF ACTION
### (Breach of Express Warranty)

98.    Plaintiff hereby incorporates by reference all previous paragraphs, as though
alleged fully in this Cause of Action.

99.    Defendants expressly warranted to Plaintiff Vikki Timms by and through their
authorized agents or sales representatives, in publications, package inserts, the internet, and other
communications intended for physicians, patients, Plaintiff, and the general public, that the

---
18
COMPLAINT

EXHIBIT   2 — 000059

1  Pinnacle Hip was safe, effective, fit and proper for its intended use.

2      100.   In allowing the implantation of the Pinnacle Hip, Plaintiff Vikki Timms and
3  Plaintiff's physicians relied on the skill, judgment, representations, and express warranties of
4  Defendants. These warranties and representations were false in that the Pinnacle Hip was not
5  safe and was unfit for the uses for which it was intended.

6      101.   Through sale of the Pinnacle Hip, Defendants are merchants pursuant to Section
7  2314 of the Uniform Commercial Code.

8      102.   Defendants breached their warranty of the mechanical soundness of the Pinnacle
9  Hip by continuing sales and marketing campaigns highlighting the safety and efficacy of their
10  product, while they knew of the defects and risk of product failure and resulting patient injuries.

11      103.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has
12  sustained and will continue to sustain severe physical injuries, severe emotional distress, mental
13  anguish, economic losses and other damages. As a direct result, Plaintiff expended money and
14  will continue to expend money for medical bills and expenses. Plaintiff is entitled to
15  compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

16              **EIGHTH CAUSE OF ACTION**
17              **(Negligent Misrepresentation)**

18      104.   Plaintiff hereby incorporates by reference all previous paragraphs, as though
19  alleged fully in this Cause of Action.

20      105.   At the time Defendants manufactured, designed, marketed, sold and distributed
21  the Pinnacle Hip for use by Plaintiff Vikki Timms, Defendants knew or should have known of
22  the use for which the Pinnacle Hip was intended and the serious risks and dangers associated
23  with such use of the Pinnacle Hip.

24      106.   Defendants owed a duty to treating physicians and to the ultimate end-users of the
25  Pinnacle Hip, including Plaintiff, to accurately and truthfully represent the risks of Pinnacle Hip.
26  Defendants breached that duty by misrepresenting and/or failing to adequately warn Plaintiff's
27  physicians, the medical community, Plaintiff, and the public about the risks of the Pinnacle Hip,

28

                        19
                     COMPLAINT

EXHIBIT  2 - 000060

which Defendants knew or in the exercise of diligence should have known.

107.   Among Defendants' numerous misrepresentations and misleading omissions to Plaintiff, Plaintiff's physicians and the general public are Defendants' assurances to orthopedic surgeons that the Pinnacle Hip was a safe and effective medical device. Defendants stated or implied to orthopedic surgeons that any problem with the Pinnacle Hip in a particular patient was attributable to "surgical technique." Defendants made such statements even after they became aware of numerous and serious complications with the Pinnacle Hip. Defendants did not reveal (and instead concealed) their knowledge of numerous and serious complications with the Pinnacle Hip. Despite their knowledge of serious problems with the Pinnacle Hip, Defendants continued and continue to market the Pinnacle Hip.

108.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages. As a direct result, Plaintiff expended money and will continue to expend money for medical bills and expenses. Plaintiff is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

### NINTH CAUSE OF ACTION
### (Intentional Misrepresentation)

109.   Plaintiff hereby incorporates by reference all previous paragraphs, as though alleged fully in this Cause of Action.

110.   Defendants, having undertaken to prepare, design, research, develop, manufacture, inspect, label, market, promote and sell the Pinnacle Hip, owed a duty to provide accurate and complete information to Plaintiff, her physicians, and the public regarding the Pinnacle Hip.

111.   However, Defendants misled Plaintiff, Plaintiff's physicians, and the public into believing that the Pinnacle Hip was safe and effective for use in hip replacement surgery; engaged in deceptive, misleading and unconscionable promotional or sales methods to convince health care professionals and patients to use the Pinnacle Hip, even though Defendants knew or should have known that the Pinnacle Hip was unreasonably unsafe. Defendants also failed to

20
COMPLAINT

EXHIBIT  2  —  000061

1 | warn health care professionals and the public about the safety risks of the Pinnacle Hip they
2 | designed, marketed and sold.

3 |    112.  Defendants' advertising program and promotional items, by containing
4 | affirmative misrepresentations and omissions, falsely and deceptively sought to create the image
5 | and impression that the Pinnacle Hip was safe for human use, had no unacceptable side effects,
6 | and would not interfere with daily life.

7 |    113.  Defendants purposefully concealed, failed to disclose, misstated, downplayed and
8 | understated the health hazards and risks associated with the use of the Pinnacle Hip. Defendants,
9 | through promotional practices, deceived potential treating physicians, Plaintiff, other patients,
10 | and the public. Defendants falsely and deceptively kept relevant information from potential
11 | treating physicians, the FDA and the general public, including Plaintiff, regarding the safety of
12 | the Pinnacle Hip.

13 |    114.  Defendants expressly denied that the Pinnacle Hip created an increased risk of
14 | injury and took affirmative steps to prevent the discovery and dissemination of any evidence on
15 | the increased likelihood of injury from the Pinnacle Hip.

16 |    115.  Defendants did not accurately report the results of adverse events by fraudulently
17 | and intentionally withholding from the FDA, physicians, Plaintiff, and the public, the truth
18 | regarding Pinnacle Hip failures for months, if not years, all the while undertaking a major
19 | advertising campaign to sell the Pinnacle Hip. Defendants received reports of the Pinnacle Hip
20 | defects from various sources, and intentionally withheld this information, while continuing to
21 | sell the Pinnacle Hip for implantation in individuals such as Plaintiff.

22 |    116.  Defendants effectively deceived and misled the scientific and medical
23 | communities regarding the risks and benefits of the Pinnacle Hip. Defendants failed to fully
24 | inform physicians, patients, including Plaintiff, and the public of the true defects in the Pinnacle
25 | Hip, defects that were known to Defendants, and continued to assure physicians and patients that
26 | the Pinnacle Hip was adequate and reliable for the purpose intended and continued and continue
27 | to sell the Pinnacle Hip.

28 |

21
COMPLAINT

EXHIBIT  2 — 000062

117.   Through the materials they disseminated, Defendants falsely and deceptively misrepresented or omitted a number of material facts regarding the Pinnacle Hip.

118.   Defendants possessed evidence demonstrating the Pinnacle Hip caused serious adverse side effects. Nevertheless, Defendants continued to market the Pinnacle Hip by providing false and misleading information with regard to its safety to Plaintiff and Plaintiff's treating physicians.

119.   Among Defendants' numerous misrepresentations and misleading omissions to Plaintiff, Plaintiff's physicians and the general public are Defendants' assurances to orthopedic surgeons that the Pinnacle Hip was a safe and effective medical device. Defendants stated or implied to orthopedic surgeons that any problem with the Pinnacle Hip in a particular patient was attributable to "surgical technique." Defendants made such statements even after they became aware of numerous and serious complications with the Pinnacle Hip. Defendants did not reveal (and instead concealed) their knowledge of numerous and serious complications with the Pinnacle Hip. Despite their knowledge of serious problems with the Pinnacle Hip, Defendants continued and continue to market the Pinnacle Hip.

120.   Defendants engaged in all the acts and omissions described above with the intent that Plaintiff's physicians and Plaintiff would rely on the misrepresentation, deception and concealment in deciding to use Defendants' Pinnacle Hip rather than another DePuy product or a competitors' similar product.

121.   Plaintiff and/or Plaintiff's physicians justifiably relied to their detriment on Defendants' intentional and fraudulent misrepresentations as set out above. This reliance proximately caused the injuries and damages described in this Complaint.

122.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages. As a direct result, Plaintiff expended money and will continue to expend money for medical bills and expenses. Plaintiff is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

EXHIBIT  2 — 000063

### TENTH CAUSE OF ACTION
**(Constructive Fraud)**

123.   Plaintiff hereby incorporates by reference all previous paragraphs, as though alleged fully in this Cause of Action.

124.   At the time Defendants sold the Pinnacle Hip to Plaintiff, Defendants were in a unique position of knowledge concerning the safety and effectiveness of the Pinnacle Hip, which knowledge was not possessed by Plaintiff or her physicians, and Defendants thereby held a position of superiority over Plaintiff.

125.   Through their unique knowledge and expertise regarding the defective nature of the Pinnacle Hip, and through their statements to physicians and their patients in advertisements, promotional materials, and other communications, Defendants professed to Plaintiff that they had knowledge of the truth of the representation that the Pinnacle Hip was safe and effective for its intended use and was not defective.

126.   Defendants' representations to Plaintiff, the medical community, and the public were unqualified statements made to induce Plaintiff and Plaintiff's physicians to purchase and use the Pinnacle Hip; and Plaintiff and her physicians relied upon the statements when purchasing the device and having it implanted in her body.

127.   Defendants have made numerous misrepresentations and misleading omissions to Plaintiff, Plaintiff's physicians and the general public. Among Defendants' numerous misrepresentations and misleading omissions to Plaintiff, Plaintiff's physicians and the general public are Defendants' assurances to orthopedic surgeons that the Pinnacle Hip was a safe and effective medical device. Defendants stated or implied to orthopedic surgeons that any problem with the Pinnacle Hip in a particular patient was attributable to "surgical technique." Defendants made such statements even after they became aware of numerous and serious complications with the Pinnacle Hip. Defendants did not reveal (and instead concealed) their knowledge of numerous and serious complications with the Pinnacle Hip. Despite their knowledge of serious problems with the Pinnacle Hip, Defendants continued and continue to market the Pinnacle Hip.

---
21
COMPLAINT

EXHIBIT   2 — 000064

128.   Defendants took unconscionable advantage of their dominant position of knowledge with regard to Plaintiff and engaged in constructive fraud in their relationship with Plaintiff. Plaintiff and/or Plaintiff's physicians reasonably relied on Defendants' representations.

129.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages. As a direct result, Plaintiff expended money and will continue to expend money for medical bills and expenses. Plaintiff is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

### ELEVENTH CAUSE OF ACTION
#### (Violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

130.   Plaintiff hereby incorporates by reference all previous paragraphs, as though alleged fully in this Cause of Action.

131.   Plaintiff brings this cause of action pursuant to California Business & Professions Code § 17204, in their individual capacities, and not on behalf of the general public.

132.   California Business & Professions Code § 17200 provides that unfair competition shall mean and include "all unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

133.   The acts and practices described in Paragraphs 1 through 38 above were and are likely to mislead the general public, were conducted in California and elsewhere, and therefore constitute unfair business practices within the meaning of Business & Professions Code § 17200. The acts of untrue and misleading advertising and marketing set forth in the preceding paragraphs are incorporated by reference and are, by definition, violations of Business & Professions Code § 17200. This conduct includes, but is not limited to:

   a.   Representing to Plaintiff, Plaintiff's physicians and the general public that the Pinnacle Hip was safe, fit and effective for its intended purposes, knowing that said representations were false, and concealing from the Plaintiff, Plaintiff's physicians and the general public that said Pinnacle Hip had a serious propensity

EXHIBIT  2 — 000065

1    to cause injuries to users;

2    b.    Engaging in advertising programs designed to create the image, impression and

3    belief by consumers, physicians and others that the Pinnacle Hip was safe for

4    human use, even though Defendants knew this to be false, and even though

5    Defendants had no reasonable grounds to believe this to be true;

6    c.    Purposely downplaying and understating the health hazards and risks associated

7    with the Pinnacle Hip;

8    d.    Failing to conduct sufficient inspections and testing of the Pinnacle Hip;

9    e.    Continuing to promote the use of the Pinnacle Hip to physicians despite knowing

10    that there were severe problems associated with implantation; and

11    f.    Failing to provide adequate warnings regarding the dangerous defects in the

12    Pinnacle Hip.

13    134.    Defendants, and each of them, have made numerous misrepresentations and

14    misleading omissions to Plaintiff, Plaintiff's physicians and the general public. Among

15    Defendants' numerous misrepresentations and misleading omissions to Plaintiff, Plaintiff's

16    physicians and the general public are Defendants' assurances to orthopedic surgeons that the

17    Pinnacle Hip was a safe and effective medical device. Defendants stated or implied to orthopedic

18    surgeons that any problem with the Pinnacle Hip in a particular patient was attributable to

19    "surgical technique." Defendants made such statements even after they became aware of

20    numerous and serious complications with the Pinnacle Hip. Defendants did not reveal (and

21    instead concealed) their knowledge of numerous and serious complications with the Pinnacle Hip.

22    Despite their knowledge of serious problems with the Pinnacle Hip, Defendants continued and

23    continue to market the Pinnacle Hip.

24    135.    Despite their knowledge of serious problems with the Pinnacle Hip, DePuy did

25    not warn the medical community, patients, or the general public about the Pinnacle Hip's risks,

26    and continued to promote, market, sell and defend the Pinnacle Hip.

27    136.    These practices constitute unlawful, unfair and fraudulent business acts or

28

EXHIBIT  2 - 000066

practices, within the meaning of California Business & Professions Code § 17200, as well as unfair, deceptive, untrue and misleading advertising as prohibited by California Business & Professions Code § 17500.

137.   As a result of their conduct described above, Defendants have been and will be unjustly enriched. Specifically, Defendants Dr. Schmalzried and TPS Corp. have been unjustly enriched by their receipt of millions of dollars in ill-gotten gains in the form of royalties and consulting fees for their design of, and the subsequent sale and prescription of, said Pinnacle Hips, sold in large part as a result of the acts and omissions described herein. The DePuy Defendants have been unjustly enriched by their receipt of millions of dollars in ill-gotten gains in the form of revenues and profits from the sale of the Pinnacle Hip in California and throughout the United States, sold in large part as a result of the acts and omissions described herein.

138.   Because of the fraudulent omissions and misrepresentations made by Defendants as detailed above, and the inherently unfair practice of committing a fraud against the public by intentionally misrepresenting and concealing material information, Defendants' acts and omissions described herein constitute unfair or fraudulent business practices.

139.   Plaintiff, pursuant to California Business & Professions Code § 17203, seeks an order of this court compelling Defendants to disgorge the monies collected and profits realized by them as a result of their unfair business practices.

## TWELFTH CAUSE OF ACTION
### (Violation of Cal. Bus. & Prof. Code §§ 17500, *et seq.*)

140.   Plaintiff hereby incorporates by reference all previous paragraphs, as though alleged fully in this Cause of Action.

141.   Plaintiff brings this cause of action pursuant to California Business & Professions Code §17535, in her individual capacity and not on behalf of the general public.

142.   California Business & Professions Code § 17500 provides that it is unlawful for any person, firm, corporation or association to dispose of property or perform services, or to

EXHIBIT 2 — 000067

1   induce the public to enter into any obligation relating thereto, through the use of untrue or

2   misleading statements.

3       143.   At all times herein mentioned, Defendants, through their conduct in California

4   and elsewhere, have committed acts of disseminating untrue and misleading statements as

5   defined by Business & Professions Code § 17500 by engaging in the following acts and practices

6   with intent to induce members of the public to purchase and use the Pinnacle Hip:

7       a.   Representing to Plaintiff, Plaintiff's physicians and the general public that the

8          Pinnacle Hip was safe, fit and effective for its intended purposes, knowing that said

9          representations were false, and concealing from the Plaintiff, Plaintiff's physicians

10        and the general public that said Pinnacle Hip had a serious propensity to cause

11        injuries to users;

12       b.   Engaging in advertising programs designed to create the image, impression and

13         belief by consumers, physicians and others that the Pinnacle Hip was safe for human

14         use, even though Defendants knew this to be false, and even though Defendants had

15         no reasonable grounds to believe them to be true;

16       c.   Purposely downplaying and understating the health hazards and risks associated with

17         the Pinnacle Hip; and

18       d.   Continuing to promote the use of the Pinnacle Hip to physicians despite knowing that

19         there were severe problems associated with its implantation.

20

21       144.   Defendants have made numerous misrepresentations and misleading omissions to

22   Plaintiff, Plaintiff's physicians and the general public.  Among Defendants' numerous

23   misrepresentations and misleading omissions to Plaintiff, Plaintiff's physicians and the general

24   public are Defendants' assurances to orthopedic surgeons that the Pinnacle Hip was a safe and

25   effective medical device. Defendants stated or implied to orthopedic surgeons that any problem

26   with the Pinnacle Hip in a particular patient was attributable to "surgical technique." Defendants

27   made such statements even after they became aware of numerous and serious complications with

28

<center>27</center>
<center>COMPLAINT</center>

EXHIBIT  2 — 000068

1   the Pinnacle Hip. Defendants did not reveal (and instead concealed) their knowledge of

2   numerous and serious complications with the Pinnacle Hip. Despite their knowledge of serious

3   problems with the Pinnacle Hip, Defendants continued and continue to market the Pinnacle Hip.

4       145.   Despite their knowledge of serious problems with the Pinnacle Hip, DePuy did

5   not warn the medical community, patients, or the general public about the Pinnacle Hip's risks,

6   and continued to promote, market, sell and defend the Pinnacle Hip.

7       146.   The foregoing practices constitute false and misleading advertising within the

8   meaning of California Business & Professions Code § 17500.

9       147.   As a result of their conduct described above, Defendants have been and will be

10   unjustly enriched. Specifically, Defendants Dr. Schmalzried and TPS Corp. have been unjustly

11   enriched by their receipt of millions of dollars in ill-gotten gains in the form of royalties and

12   consulting fees for their design of, and the subsequent sale and prescription of, said Pinnacle

13   Hips, sold in large part as a result of the acts and omissions described herein. Defendants have

14   been unjustly enriched by their receipt of millions of dollars in ill-gotten gains in the form of

15   revenues and profits from the sale of the Pinnacle Hip in California and throughout the United

16   States, sold in large part as a result of the acts and omissions described herein.

17       148.   Pursuant to California Business & Professions Code § 17535, Plaintiff seeks an

18   order of this court compelling Defendants to disgorge the monies collected and profits realized

19   by Defendants as a result of their unfair business practices.

20       149.   Plaintiff seeks the imposition of a constructive trust over, and disgorgement of,

21   the monies collected and profits realized by Defendants.

22                        **THIRTEENTH CAUSE OF ACTION**
                          (Negligent Infliction of Emotional Distress)

23
24       150.   Plaintiff hereby incorporates by reference all previous paragraphs, as though
     alleged fully in this Cause of Action
25
26       151.   Defendants carelessly and negligently manufactured, marketed and sold the

27   Pinnacle Hip to Plaintiff, carelessly and negligently concealed the Pinnacle Hip defects from

28
                                          28
                                       COMPLAINT

EXHIBIT   2 − 000069

1 | Plaintiff, and carelessly and negligently misrepresented the quality, safety and usefulness of the
2 | Pinnacle Hip.

3 |     152.   Plaintiff Vikki Timms was directly involved in and directly impacted by
4 | Defendants' carelessness and negligence, in that Plaintiff has sustained and will continue to
5 | sustain severe physical injuries, and Plaintiff Vikki Timms has suffered and will continue to
6 | suffer economic losses, and other damages as a direct result of Plaintiff's (and her physician's)
7 | decisions to purchase, use and have implanted in Plaintiff's hip a defective and dangerous
8 | product manufactured, sold and distributed by Defendants.

9 |     153.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has
10 | sustained and will continue to sustain severe physical injuries, severe emotional distress, mental
11 | anguish, economic losses and other damages. As a direct result, Plaintiff expended money and
12 | will continue to expend money for medical bills and expenses.

13 | <center>**PRAYER FOR RELIEF**</center>

14 | WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

15 |     A.   For general (non-economic) damages according to proof at the time of trial;

16 |     B.   For special (economic) damages according to proof at the time of trial;

17 |     C.   For disgorgement of all revenue that Defendants have obtained through design,
18 |         promotion, marketing, manufacture, sale and administration of the Pinnacle Hip;

19 |     D.   For prejudgment interest as permitted by law;

20 |     E.   For costs of suit incurred herein as permitted by law;

21 |     F.   For such other and further relief as this Court may deem proper.

22 | <center>**DEMAND FOR JURY TRIAL**</center>

23 | Plaintiff demands a trial by jury on all issues so triable.

24 |

25 |

26 |

27 |

28 |

<center>29</center>
<center>COMPLAINT</center>

EXHIBIT  2 - 000070

DATED: June 8, 2015

Respectfully Submitted,



Chris W. Cantrell

DOYLE LOWTHER LLP
William J. Doyle II
James R. Hail
10200 Willow Creek Road, Suite 150
San Diego, CA 92131
Tel:      858.935.9960
Fax:     858.939.1939
email:   bill@doylelowther.com
           jim@doylelowther.com
           ccantrell@doylelowther.com

30
COMPLAINT

EXHIBIT  2 - 000071

## PROOF OF SERVICE

    I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 2029 Century Park East, Suite 300, Los Angeles, California  90067.  July 13, 2015, I served a copy of the within document(s):

    **1. NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. SECTION 1441(b) (DIVERSITY)**

   ☒   BY UNITED STATES MAIL by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, the United States mail at Los Angeles, California addressed as set forth below.

    in a sealed envelope, postage fully paid, addressed as follows:

DOYLE LOWTHER LLP      **Attorneys for Plaintiff**
William J. Doyle II      **VIKKI TIMMS**
James R. Hail
Chris W. Cantrell      T:  (858) 935-9960
10200 Willow Creek Road, Suite 150   F:  (858) 939-1939
San Diego, CA  92121

    Following ordinary business practices, the envelope was sealed and placed for collection and mailing on this date, and would, in the ordinary course of business, be deposited with the United States Postal Service on this date.

    I declare I am employed in the office of a member of the bar of this court at whose direction the service was made.

    Executed on July 13, 2015, at Los Angeles, California.

Brigette S. Price